# CALDERON *v.* THOMPSON

No. 97–215.   Argued December 9, 1997—Decided April 29, 1998

540

KENNEDY, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and O'CONNOR, SCALIA, and THOMAS, JJ., joined. SOUTER, J., filed a dissenting opinion, in which STEVENS, GINSBURG, and BREYER, JJ., joined, *post*, p. 566.

*Holly D. Wilkens,* Supervising Deputy Attorney General of California, argued the cause for petitioner. With her on the briefs were *Daniel E. Lungren,* Attorney General, *George Williamson,* Chief Assistant Attorney General, *Dane*

*R. Gillette*, Senior Assistant Attorney General, and *Pamela A. Ratner*, Supervising Deputy Attorney General.

*Gregory A. Long* argued the cause for respondent. With him on the brief were *Quin Denvir* and *Andrew S. Love*, by appointment of the Court, 522 U. S. 1014.*

JUSTICE KENNEDY delivered the opinion of the Court.

Thomas M. Thompson was convicted in California state court of the rape and murder of Ginger Fleischli. More than 15 years after the crime, 13 years after Thompson's conviction, and 7 years after Thompson filed his first petition for federal habeas relief, the United States Court of Appeals for the Ninth Circuit issued its mandate denying the writ of habeas corpus. Two days before Thompson's scheduled execution, however, the Court of Appeals, sitting en banc, recalled the mandate and granted habeas relief to Thompson. The case presents two issues: First, whether the Court of Appeals' order recalling its mandate violated 28 U. S. C. § 2244(b) (1994 ed., Supp. II), as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. 104–132, § 104, 110 Stat. 1218; and second, whether the

---

*Briefs of *amici curiae* urging reversal were filed for the State of Arizona et al. by *Grant Woods*, Attorney General of Arizona, *Paul J. McMurdie*, and *Randall M. Howe*, Assistant Attorney General, joined by the Attorneys General for their respective States as follows: *M. Jane Brady* of Delaware, *Robert A. Butterworth* of Florida, *Alan G. Lance* of Idaho, *Carla J. Stovall* of Kansas, *Richard P. Ieyoub* of Louisiana, *Jeremiah W. Nixon* of Missouri, *Joseph P. Mazurek* of Montana, *Don Stenberg* of Nebraska, *Frankie Sue Del Papa* of Nevada, *Dennis C. Vacco* of New York, *Michael F. Easley* of North Carolina, *Betty D. Montgomery* of Ohio, *W. A. Drew Edmondson* of Oklahoma, *D. Michael Fisher* of Pennsylvania, *Charles M. Condon* of South Carolina, *Mark W. Barnett* of South Dakota, *Jan Graham* of Utah, *Christine O. Gregoire* of Washington, and *Richard Cullen* of Virginia; and for the Criminal Justice Legal Foundation by *Kent S. Scheidegger*.

*Edward M. Chikofsky* and *Barbara E. Bergman* filed a brief for the National Association of Criminal Defense Lawyers as *amicus curiae* urging affirmance.

order was an abuse of the court's discretion. The recall of the mandate was not controlled by the precise terms of AEDPA, but this does not save the order, which, we hold, was a grave abuse of discretion.

I

A

Thompson met his 20-year-old victim, Ginger Fleischli, in the summer of 1981. Fleischli shared a Laguna Beach studio apartment with David Leitch, with whom she had an intermittent sexual relationship. In August of that year, Fleischli moved out and Thompson moved in. Fleischli took up residence with Tracy Leitch, the former wife of David Leitch.

On September 11, 1981, at about 7:30 p.m., Fleischli and Tracy Leitch encountered Thompson and David Leitch at a pizza parlor. Fleischli told Tracy Leitch she was afraid Thompson might kill her if she were left alone with him. The group later went to a bar together, but David and Tracy Leitch soon departed. At 9:30 p.m., Afshin Kashani joined Thompson and Fleischli, drinking with both of them and smoking hashish with Thompson. The trio went to a second bar before walking to Thompson's apartment around 1 a.m. At about 2 a.m., after Fleischli had gone to a nearby liquor store to buy soda, Thompson told Kashani he wanted to have sexual intercourse with Fleischli that night. He assured Kashani, however, that Kashani could "have" Fleischli after Thompson and David Leitch left for Thailand to smuggle refugees and drugs back to the United States. App. 7.

Before Fleischli returned to the apartment, Kashani began walking to his truck, which seems to have been left at a local bar. On the way, Kashani realized he had forgotten his cigarettes. He returned to the apartment, where Thompson met him at the door. Thompson appeared nervous and made Kashani wait outside while Thompson retrieved the cigarettes. After returning to his truck, Kashani looked for

Fleischli at a nearby liquor store and, not finding her, went home.

Tracy Leitch visited Thompson's apartment the morning of September 12, asking where Fleischli was. Lying, Thompson said she had left the Sandpiper Inn with Kashani the night before. At a party that evening, Tracy Leitch again asked Thompson where Fleischli was. In response, Thompson described Fleischli in the past tense, saying he had liked her. The next day, Tracy Leitch filed a missing person's report with the local police department.

On September 14, police found Fleischli's body buried in a field 10 miles from the apartment shared by Thompson and David Leitch. The body was wrapped in rope as well as a sleeping bag and blanket, both taken from the apartment. Fleischli's head was wrapped with duct tape, two towels, a sheet, and her jacket. She had been stabbed five times in the head near the right ear. The body was bruised on the ankles, palms, and left wrist; the right wrist was crushed. Fleischli's shirt and bra had been cut down the middle and pulled to her elbows, restraining her arms and exposing her breasts. She had on unbuttoned jeans, but no underwear, shoes, or socks. A vaginal swab revealed semen consistent with Thompson's blood type.

Police found two footprints near the body, one smooth and one with a wavy pattern matching a shoe worn by David Leitch. Fibers from the blanket around the body were identical to fibers found in the trunk of David Leitch's car. The rope around the body was smeared with paint from the car's trunk. Other fibers matched the carpet in the apartment, which was stained with Fleischli's blood.

On or around the day police found the body, Thompson and David Leitch went to Mexico. Leitch returned to the United States, but Mexican authorities arrested Thompson on September 26, 1981. He had handcuffs with him. When questioned by police after his return to the United States, Thompson claimed Fleischli had left his apartment with Ka-

shani the night of the murder. He also said Fleischli had been stabbed in the head, though this information had not yet been made public. He further claimed not to have had sex with Fleischli, but later asserted they had engaged in consensual sex.

We next recount the lengthy procedural history of the case.

B

On November 4, 1983, an Orange County Superior Court jury convicted Thompson of the first-degree murder and forcible rape of Fleischli. The jury made a special finding that "the homicide of Ginger Lorraine Fleischli was an intentional killing personally committed by the defendant Thomas Martin Thompson." 45 Cal. 3d 86, 117, n. 23, 753 P. 2d 37, 56, n. 23 (1988). The jury further found the special circumstance of murder during the commission of rape, making Thompson eligible for the death penalty. After penalty phase proceedings the jury was unanimous in recommending a capital sentence, which the trial judge imposed. In a later trial, a different jury found David Leitch guilty of second-degree murder for his role in Fleischli's slaying.

On April 28, 1988, the California Supreme Court unanimously affirmed Thompson's rape and murder convictions and the jury's finding of the rape special circumstance. The court also affirmed Thompson's death sentence, with two of seven justices dissenting. The dissenters concurred in the affirmance of the murder and rape convictions and the rape special circumstance, but asserted the jury's sentencing recommendation had been influenced in an improper manner by evidence that Thompson had solicited the murder of David Leitch. *Id.*, at 144–145, 753 P. 2d, at 74–75. Thompson petitioned for rehearing, which the court denied in June 1988. Thompson also filed a petition for certiorari with this Court, which we denied. 488 U. S. 960 (1988).

Thompson filed his first state habeas petition, which the California Supreme Court denied in March 1989. Thompson

filed a federal habeas petition in January 1990. The District Court held Thompson's petition in abeyance while Thompson pursued unexhausted claims in state court. In January 1991, the California Supreme Court denied Thompson's second state habeas petition. In February 1993, the California Supreme Court denied Thompson's third state habeas petition.

In November 1993, the United States District Court for the Central District of California held an evidentiary hearing on the claims raised in Thompson's federal habeas petition. In an order dated March 28, 1995, the District Court granted habeas relief as to the rape conviction and rape special circumstance and denied relief as to the murder conviction. In the District Court's view, Thompson's trial attorney rendered ineffective assistance of counsel as to the rape charge. The District Court cited two failings by the attorney. First, the court held, counsel failed to contest certain of the conclusions offered by the State's forensic expert at trial. Second, the court determined, counsel should have impeached the credibility of two jailhouse informants to a greater extent than he did. In the District Court's view, these failings prejudiced Thompson under the rule of *Strickland* v. *Washington*, 466 U. S. 668 (1984). Having granted relief as to the rape special circumstance, the District Court ruled Thompson's death sentence was invalid. As to the murder conviction, the District Court rejected Thompson's claim he had been prejudiced by what Thompson alleged were inconsistencies between the prosecution's theories at his trial and the later trial of David Leitch. Having read the transcripts of both trials, the court found "the trials differed mainly in emphasis." App. 71.

The timing of later federal proceedings is critical to the issues we now resolve. On June 19, 1996, a unanimous three-judge panel of the Court of Appeals reversed the District Court's grant of habeas relief as to the rape conviction and rape special circumstance, affirmed the denial of habeas

relief as to the murder conviction, and reinstated Thompson's death sentence. Noting that "[t]he State presented strong evidence of rape" at Thompson's trial, 109 F. 3d 1358, 1365 (CA9 1997), the court held that, irrespective of whether the performance of Thompson's counsel was deficient in the manner Thompson alleged, Thompson could not demonstrate prejudice under *Strickland.*

On August 5, 1996, Thompson filed a petition for rehearing and suggestion for rehearing en banc, which circulated to "each active judge" of the court. See *U. S. Court of Appeals for the Ninth Circuit General Orders* 5.4(a)(1), p. 30 (Aug. 1997). In an order dated March 6, 1997, the original panel denied the petition and rejected the suggestion, observing that "[t]he full court has been advised of the suggestion for rehearing en banc and no judge in active service has requested a vote to rehear the matter en banc." App. 137. *In the same order, the panel reissued its opinion in the case with minor changes.* Thompson filed a petition for certiorari with this Court, which we denied on June 2, 1997. 520 U. S. 1259. The Court of Appeals issued its mandate denying all habeas relief in Thompson's case on June 11, 1997. In response, the State of California scheduled Thompson's execution for August 5, 1997.

Thompson filed a fourth state habeas petition on July 3, 1997. In it, he alleged David Leitch had stated in a parole hearing that he had witnessed Thompson and Fleischli engaged in what appeared to be consensual intercourse on the night of Fleischli's murder. The California Supreme Court denied the petition on July 16, 1997.

On July 22, 1997, Thompson filed a motion with the Court of Appeals to recall its mandate denying habeas relief. The following day, Thompson filed a motion in United States District Court for relief from judgment pursuant to Federal Rule of Civil Procedure 60(b). In support of both motions, Thompson cited Leitch's alleged statement that he had seen Thompson and Fleischli engaged in consensual sex.

The District Court denied Thompson's Rule 60(b) motion on July 25, 1997. The court construed the motion to be a successive petition under 28 U. S. C. § 2244 as amended by AEDPA, ruling that Thompson "must not be permitted to utilize a Rule 60(b) motion to make an end-run around the requirements" of AEDPA. App. 170. The court observed that the alleged new statement by Leitch conflicted with Thompson's own account of the specifics of his encounter with Fleischli, the physical evidence in the case, and the previous stories told by Leitch himself. Thus, the court held, Thompson "certainly cannot make the requisite showing that he is actually innocent such that his execution would be a miscarriage of justice." *Id.*, at 188.

The Court of Appeals denied Thompson's motion to recall the mandate on July 28, 1997. Two days later, however, the full court voted to consider en banc whether to recall its earlier mandate "to consider whether the panel decision of our court would result in a fundamental miscarriage of justice." 120 F. 3d 1042, 1043. The court scheduled oral argument on this question for August 1, 1997, four days before Thompson's scheduled execution.

Meanwhile, on July 29, 1997, the Governor of California held a hearing on whether to grant clemency to Thompson. In addition to the arguments presented by Thompson's attorneys during the hearing, the Governor reviewed "the materials submitted on [Thompson's] behalf, the petition and letters signed by supporters of clemency, the submissions of the Orange County District Attorney, the letters of the trial judge concerning clemency," all the court opinions in Thompson's case, and "the materials and recommendation provided to [him] by the Board of Prison Terms." App. to Brief for Criminal Justice Legal Foundation as *Amicus Curiae* A–2 to A–3 (Decision of Governor Pete Wilson). In a comprehensive decision dated July 31, 1997, the Governor found Thompson "ha[d] not remotely approached making any" showing of innocence of rape or murder. *Id.*, at A–16. The

Governor agreed with the view of the judge who presided over Thompson's trial, that "it would be an absolute tragedy and a travesty of justice to even seriously consider clemency in this case." *Ibid.* (internal quotation marks omitted). Clemency was denied.

Two days before Thompson was to be executed, a divided en banc panel of the Court of Appeals recalled the court's mandate of June 11, 1997. This action came 53 days after the mandate had issued and almost a full year after Thompson had filed his suggestion for rehearing en banc. The Court of Appeals asserted it did not recall the mandate on the basis of Thompson's later motion for recall, but did so *sua sponte,* on the basis of the claims and evidence presented in Thompson's first federal habeas petition. Thus, the court said, its "recall of the mandate is not predicated on any new evidence or claims Thompson raises in his motion to recall the mandate." 120 F. 3d 1045, 1049, n. 3. The court stated it had considered whether to recall the mandate sooner, but had chosen to wait until the conclusion of Thompson's state-court proceedings before taking action.

The court presented two bases for recalling its earlier mandate. First, the court asserted that, absent certain "procedural misunderstandings within [the] court," it would have called for en banc review of the underlying decision before issuing the mandate denying relief. *Id.,* at 1047. These procedural misunderstandings included a mishandled law clerk transition in one judge's chambers and the failure of another judge to notice that the original panel had issued its opinion in the case. *Id.,* at 1067 (Kozinski, J., dissenting). Second, the en banc court asserted the decision of the original panel "would lead to a miscarriage of justice." *Id.,* at 1048.

Having recalled the mandate in Thompson's case, the en banc court went on to address the merits of his first federal habeas petition. The court held that Thompson's trial counsel had provided ineffective assistance as to the rape charge

and rape special circumstance, to the defendant's prejudice. A plurality of the court would have granted habeas relief on the additional ground of inconsistent theories by the prosecution at his trial and the later trial of David Leitch. The majority made no effort to determine whether Thompson was actually innocent of the rape and murder of Fleischli. The court nonetheless affirmed the District Court's grant of the writ as to the rape conviction and rape special circumstance, vacated Thompson's death sentence, and further "remand[ed] the question of the murder conviction for [the District Court's] initial consideration in light of our vacatur of the rape conviction." *Id.*, at 1060. Thus, almost 16 years after Fleischli's murder, the Ninth Circuit directed the District Court to "enter the partial writ unless the State elects to retry Thompson within a reasonable time." *Ibid.*

Four judges dissented. Judge Hall argued the majority's decision allowed Thompson to evade AEDPA's restrictions on successive petitions. *Id.*, at 1064–1066. Judge Kozinski detailed the circumstances which led the majority to find its en banc process had malfunctioned. He asserted that, contrary to the majority's conclusion, the court's en banc process "operated just as it's supposed to." *Id.*, at 1067. In a third dissenting opinion, Judge Kleinfeld recited in detail the evidence of Thompson's guilt of rape. *Id.*, at 1073.

Within hours of the Court of Appeals' order recalling its mandate, the State of California filed with this Court a second petition for a writ of mandamus, which we construed as a petition for certiorari. We granted the petition, 521 U. S. 1136 (1997), and now reverse.

## II

Although some Justices have expressed doubt on the point, see, *e. g., United States* v. *Ohio Power Co.*, 353 U. S. 98, 102–103 (1957) (Harlan, J., dissenting), the courts of appeals are recognized to have an inherent power to recall their mandates, subject to review for an abuse of discretion. *Hawaii*

*Housing Authority* v. *Midkiff,* 463 U. S. 1323, 1324 (1983) (REHNQUIST, J., in chambers); see also *Hazel-Atlas Glass Co.* v. *Hartford-Empire Co.,* 322 U. S. 238, 249–250 (1944). In light of "the profound interests in repose" attaching to the mandate of a court of appeals, however, the power can be exercised only in extraordinary circumstances. 16 C. Wright, A. Miller, & E. Cooper, Federal Practice and Procedure § 3938, p. 712 (2d ed. 1996). The sparing use of the power demonstrates it is one of last resort, to be held in reserve against grave, unforeseen contingencies.

The en banc majority asserted extraordinary circumstances justified its order recalling the mandate in Thompson's case because, "[b]ut for procedural misunderstandings by some judges of this court, an en banc call would have been made and voted upon at the ordinary time." 120 F. 3d, at 1048. As noted earlier, the original panel issued its decision denying habeas relief on June 19, 1996, and Thompson filed a petition for rehearing and suggestion for rehearing en banc on August 5, 1996. On January 17, 1997, the panel notified the full court of its intention to reject the suggestion. *Id.,* at 1067 (Kozinski, J., dissenting). The panel reissued its earlier opinion with minor revisions on March 6, 1997. In the March 6 order, the panel also denied Thompson's petition for rehearing and rejected his suggestion for rehearing en banc. The panel observed that, although the full court had been advised of Thompson's suggestion, no judge in active service had requested a vote to rehear the case en banc within the time specified in the General Orders of the Ninth Circuit. App. 137.

It appears from Judge Kozinski's opinion that the following events also transpired. On March 12, 1997, an off-panel judge wrote to the panel, requesting an opportunity to make a belated call for a vote to rehear the case en banc. The judge stated that the panel's decision had been "circulated shortly before a law clerk transition" in the judge's chambers, and that "the old and new law clerks assigned to the

case failed to communicate." 120 F. 3d, at 1067 (dissenting opinion). Another judge seconded the request and asked: "Was [the panel's January 17, 1997, notice of intention to reject the suggestion for rehearing en banc] circulated? Did I miss it?" *Ibid.* The author of the panel opinion denied the request for a belated en banc call, explaining that the requesting judges had been notified two months earlier of the panel's intention to reject Thompson's suggestion, *id.*, at 1067–1068, which itself had circulated to every active judge of the court on August 5, 1996.

The panel stayed the issuance of its mandate pending Thompson's petition to this Court for certiorari review. We denied Thompson's petition on June 2, 1997. 520 U. S. 1259. The Court of Appeals issued its mandate on June 11, 1997. According to the en banc majority, "[a] sua sponte request to consider en banc whether to recall the mandate was made shortly thereafter, even before the mandate was spread in the district court." 120 F. 3d, at 1049. "[I]n the interests of comity," however, the court delayed further action until the California Supreme Court had denied Thompson's fourth state petition for habeas relief. *Ibid.* It was not until August 3, 1997—two days before Thompson was scheduled to be executed—that the Ninth Circuit voted to recall its mandate.

Measured even by standards of general application, the Court of Appeals' decision to recall the mandate rests on the most doubtful of grounds. A mishandled law clerk transition in one judge's chambers, and the failure of another judge to notice the action proposed by the original panel, constitute the slightest of bases for setting aside the "deep rooted policy in favor of the repose of judgments." *Hazel-Atlas Glass Co., supra,* at 244. This is especially true where the only consequence of the oversights was the failure of two judges to contribute their views to a determination that had been given full consideration on the merits by a panel of the court.

Even if the Ninth Circuit's en banc process did somehow malfunction—which is itself open to question, see 120 F. 3d, at 1067 (Kozinski, J., dissenting) ("[T]he process operated just as it's supposed to")—the court only compounded its error when it delayed further action for more than four months after the alleged misunderstandings took place. The promptness with which a court acts to correct its mistakes is evidence of the adequacy of its grounds for reopening the case. In this case, the two judges first revealed their oversights to the full court in March 1997. At that point the two judges remained free to "request that the [full] court vote to suspend" its time limits for voting to rehear the case en banc. See Ninth Circuit General Orders 11.11, at 83. They chose not to do so, instead waiting another four months to make what was, in effect, an identical request. The Court of Appeals for all practical purposes lay in wait while this Court acted on the petition for certiorari, the State scheduled a firm execution date for Thompson, and the Governor conducted an exhaustive clemency review. Then, only two days before Thompson was scheduled to be executed, the court came forward to recall the judgment on which the State, not to mention this Court, had placed heavy reliance.

It is no answer for the Court of Appeals to assert it delayed action in the interests of comity. Comity is not limited to the judicial branch of a state government. In this case, the executive branch of California's government took extensive action in reliance on the mandate denying relief to Thompson. Rather than focus only on the California Supreme Court's interest in considering Thompson's fourth (and, as could be predicted, meritless) state habeas petition, the Court of Appeals should have considered as well the more vital interests of California's executive branch.

It would be the rarest of cases where the negligence of two judges in expressing their views is sufficient grounds to frustrate the interests of a State of some 32 million persons in enforcing a final judgment in its favor. Even if this were

a case implicating no more than ordinary concerns of finality, we would have grave doubts about the actions taken by the Court of Appeals.

## III

Thompson's is not an ordinary case, however, because he seeks relief from a criminal judgment entered in state court. To decide whether the Court of Appeals' order recalling the mandate was proper in these circumstances, we measure it not only against standards of general application, but also against the statutory and jurisprudential limits applicable in habeas corpus cases.

## A

California argues the Court of Appeals' recall of its mandate was barred by 28 U. S. C. § 2244(b) (1994 ed., Supp. II) as amended by AEDPA. Section 2244(b)(1) provides: "A claim presented in a second or successive habeas corpus application under section 2254 that was presented in a prior application shall be dismissed." Subsection 2244(b)(2) provides: "A claim presented in a second or successive application under section 2254 that was not presented in a prior application shall be dismissed" unless a narrow exception applies. The immediate question is whether the Court of Appeals recalled its mandate on the basis of a "second or successive application" for habeas relief.

In a § 2254 case, a prisoner's motion to recall the mandate on the basis of the merits of the underlying decision can be regarded as a second or successive application for purposes of § 2244(b). Otherwise, petitioners could evade the bar against relitigation of claims presented in a prior application, § 2244(b)(1), or the bar against litigation of claims not presented in a prior application, § 2244(b)(2). If the court grants such a motion, its action is subject to AEDPA irrespective of whether the motion is based on old claims (in which case § 2244(b)(1) would apply) or new ones (in which case § 2244(b)(2) would apply).

As a textual matter, § 2244(b) applies only where the court acts pursuant to a prisoner's "application." This carries implications for cases where a motion to recall the mandate is pending, but the court instead recalls the mandate on its own initiative. Whether these cases are subject to § 2244(b) depends on the underlying basis of the court's action. If, in recalling the mandate, the court considers new claims or evidence presented in a successive application for habeas relief, it is proper to regard the court's action as based on that application. In these cases, § 2244(b)(2) applies irrespective of whether the court characterizes the action as *sua sponte*.

In Thompson's case, however, the Court of Appeals was specific in reciting that it acted on the exclusive basis of Thompson's first federal habeas petition. The court's characterization of its action as *sua sponte* does not, of course, prove this point; had the court considered claims or evidence presented in Thompson's later filings, its action would have been based on a successive application, and so would be subject to § 2244(b). But in Thompson's case the court's recitation that it acted on the exclusive basis of his first federal petition is not disproved by consideration of matters presented in a later filing. Thus we deem the court to have acted on his first application rather than a successive one. As a result, the court's order recalling its mandate did not contravene the letter of AEDPA.

Although the terms of AEDPA do not govern this case, a court of appeals must exercise its discretion in a manner consistent with the objects of the statute. In a habeas case, moreover, the court must be guided by the general principles underlying our habeas corpus jurisprudence. We now consider those principles as applied to this case.

B

In light of "the profound societal costs that attend the exercise of habeas jurisdiction," *Smith* v. *Murray*, 477 U. S. 527, 539 (1986), we have found it necessary to impose signifi-

cant limits on the discretion of federal courts to grant habeas relief. See, *e. g.*, *McCleskey* v. *Zant*, 499 U. S. 467, 487 (1991) (limiting "a district court's discretion to entertain abusive petitions"); *Wainwright* v. *Sykes*, 433 U. S. 72, 90–91 (1977) (limiting courts' discretion to entertain procedurally defaulted claims); *Teague* v. *Lane*, 489 U. S. 288, 308–310 (1989) (plurality opinion of O'CONNOR, J.) (limiting courts' discretion to give retroactive application to "new rules" in habeas cases); *Brecht* v. *Abrahamson*, 507 U. S. 619, 637–638 (1993) (limiting courts' discretion to grant habeas relief on the basis of "trial error").

These limits reflect our enduring respect for "the State's interest in the finality of convictions that have survived direct review within the state court system." *Id.*, at 635; accord, *Wood* v. *Bartholomew*, 516 U. S. 1, 8 (1995) *(per curiam); Sawyer* v. *Whitley*, 505 U. S. 333, 338 (1992); *Keeney* v. *Tamayo-Reyes*, 504 U. S. 1, 7 (1992); *McCleskey, supra*, at 491–492; *Teague, supra*, at 309; *Murray* v. *Carrier*, 477 U. S. 478, 487 (1986); *Engle* v. *Isaac*, 456 U. S. 107, 127 (1982). Finality is essential to both the retributive and the deterrent functions of criminal law. "Neither innocence nor just punishment can be vindicated until the final judgment is known." *McCleskey, supra*, at 491. "Without finality, the criminal law is deprived of much of its deterrent effect." *Teague, supra*, at 309.

Finality also enhances the quality of judging. There is perhaps "nothing more subversive of a judge's sense of responsibility, of the inner subjective conscientiousness which is so essential a part of the difficult and subtle art of judging well, than an indiscriminate acceptance of the notion that all the shots will always be called by someone else." Bator, Finality in Criminal Law and Federal Habeas Corpus for State Prisoners, 76 Harv. L. Rev. 441, 451 (1963).

Finality serves as well to preserve the federal balance. Federal habeas review of state convictions frustrates " 'both the States' sovereign power to punish offenders and their

good-faith attempts to honor constitutional rights.'" *Murray* v. *Carrier, supra,* at 487 (quoting *Engle, supra,* at 128). "Our federal system recognizes the independent power of a State to articulate societal norms through criminal law; but the power of a State to pass laws means little if the State cannot enforce them." *McCleskey,* 499 U. S., at 491.

A State's interests in finality are compelling when a federal court of appeals issues a mandate denying federal habeas relief. At that point, having in all likelihood borne for years "the significant costs of federal habeas review," *id.,* at 490–491, the State is entitled to the assurance of finality. When lengthy federal proceedings have run their course and a mandate denying relief has issued, finality acquires an added moral dimension. Only with an assurance of real finality can the State execute its moral judgment in a case. Only with real finality can the victims of crime move forward knowing the moral judgment will be carried out. See generally *Payne* v. *Tennessee,* 501 U. S. 808 (1991). To unsettle these expectations is to inflict a profound injury to the "powerful and legitimate interest in punishing the guilty," *Herrera* v. *Collins,* 506 U. S. 390, 421 (1993) (O'CONNOR, J., concurring), an interest shared by the State and the victims of crime alike.

This case well illustrates the extraordinary costs associated with a federal court of appeals' recall of its mandate denying federal habeas relief. By July 31, 1997, to vindicate the laws enacted by the legislature of the State of California, a jury had convicted Thompson of rape and murder and recommended that he be executed; the trial judge had imposed a sentence of death; the California Supreme Court had affirmed Thompson's sentence and on four occasions refused to disturb it on collateral attack; and, in a comprehensive and public decision, the Governor had determined the sentence was just. Relying upon the mandate denying habeas relief to Thompson, the State of California had invoked its entire legal and moral authority in support of executing its judg-

ment. Yet, after almost 13 years of state and federal review of Thompson's conviction and sentence, almost one year after Thompson filed his petition for rehearing and suggestion for rehearing en banc, a full 53 days after issuance of the mandate denying relief, and a mere two days before Thompson was scheduled to be executed, the Ninth Circuit recalled its mandate and granted the writ of habeas corpus. The costs imposed by these actions are as severe as any that can be imposed in federal habeas review.

We should be clear about the circumstances we address in this case. We deal not with the recall of a mandate to correct mere clerical errors in the judgment itself, similar to those described in Federal Rule of Criminal Procedure 36 or Federal Rule of Civil Procedure 60(a). The State can have little interest, based on reliance or other grounds, in preserving a mandate not in accordance with the actual decision rendered by the court. This also is not a case of fraud upon the court, calling into question the very legitimacy of the judgment. See *Hazel-Atlas Glass Co.* v. *Hartford-Empire Co.*, 322 U. S. 238 (1944). Nor is this a case where the mandate is stayed under Federal Rule of Appellate Procedure 41 pending the court's disposition of a suggestion for rehearing en banc.

Rather, we are concerned with cases where, as here, a court of appeals recalls its mandate to revisit the merits of its earlier decision denying habeas relief. In these cases, the State's interests in finality are all but paramount, without regard to whether the court of appeals predicates the recall on a procedural misunderstanding or some other irregularity occurring prior to its decision. The prisoner has already had extensive review of his claims in federal and state courts. In the absence of a strong showing of "actua[l] innocen[ce]," *Murray* v. *Carrier, supra,* at 496, the State's interests in actual finality outweigh the prisoner's interest in obtaining yet another opportunity for review.

Based on these considerations, we hold the general rule to be that, where a federal court of appeals *sua sponte* recalls its mandate to revisit the merits of an earlier decision denying habeas corpus relief to a state prisoner, the court abuses its discretion unless it acts to avoid a miscarriage of justice as defined by our habeas corpus jurisprudence. The rule accommodates the need to allow courts to remedy actual injustice while recognizing that, at some point, the State must be allowed to exercise its " 'sovereign power to punish offenders.' " *McCleskey, supra,* at 491 (quoting *Murray* v. *Carrier,* 477 U. S., at 487).

This standard comports with the values and purposes underlying AEDPA. Although AEDPA does not govern this case, see *supra,* at 554, its provisions "certainly inform our consideration" of whether the Court of Appeals abused its discretion. *Felker* v. *Turpin,* 518 U. S. 651, 663 (1996). Section 2244(b) of the statute is grounded in respect for the finality of criminal judgments. With the exception of claims based on new rules of constitutional law made retroactive by this Court, see § 2244(b)(2)(A), a federal court can consider a claim presented in a second or successive application only if the prisoner shows, among other things, that the facts underlying the claim establish his innocence by clear and convincing evidence. See § 2244(b)(2)(B). It is true that the miscarriage of justice standard we adopt today is somewhat more lenient than the standard in § 2244(b)(2)(B). See, *e. g.,* § 2244(b)(2)(B)(i) (factual predicate for claim must "not have been discover[able] previously through the exercise of due diligence"). The miscarriage of justice standard is altogether consistent, however, with AEDPA's central concern that the merits of concluded criminal proceedings not be revisited in the absence of a strong showing of actual innocence. And, of course, the rules applicable in all cases where the court recalls its mandate, see *supra,* at 549–553, further ensure the practice is limited to the most rare and extraordinary case.

Like other standards applicable in habeas cases, moreover, the miscarriage of justice standard is objective in content, "[w]ell defined in the case law," and "familiar to federal courts." *McCleskey*, 499 U. S., at 496. It is indeed the standard the Ninth Circuit determined to apply in voting to consider en banc whether to recall the mandate in Thompson's case. See App. 194 (Order of July 30, 1997) ("The full court has voted to consider whether to recall the mandate to consider whether the panel decision of our court would result in a fundamental miscarriage of justice"). Hence the standard is not only a just but also " 'a sound and workable means of channeling the discretion of federal habeas courts.' " *McCleskey, supra,* at 496 (quoting *Murray* v. *Carrier, supra,* at 497).

We now determine whether this standard was met in Thompson's case.

## C

"[T]he miscarriage of justice exception is concerned with actual as compared to legal innocence." *Sawyer*, 505 U. S., at 339. We have often emphasized "the narrow scope" of the exception. *Id.*, at 340; accord, *Harris* v. *Reed*, 489 U. S. 255, 271 (1989) (O'CONNOR, J., concurring) ("narrow exception" for the " 'extraordinary case' "). "To be credible," a claim of actual innocence must be based on reliable evidence not presented at trial. *Schlup* v. *Delo*, 513 U. S. 298, 324 (1995). Given the rarity of such evidence, "in virtually every case, the allegation of actual innocence has been summarily rejected." *Ibid.* (internal quotation marks omitted).

Although demanding in all cases, the precise scope of the miscarriage of justice exception depends on the nature of the challenge brought by the habeas petitioner. If the petitioner asserts his actual innocence of the underlying crime, he must show "it is more likely than not that no reasonable juror would have convicted him in light of the new evidence" presented in his habeas petition. *Id.*, at 327. If, on the other hand, a capital petitioner challenges his death sentence

in particular, he must show "by clear and convincing evidence" that no reasonable juror would have found him eligible for the death penalty in light of the new evidence. *Sawyer, supra,* at 348.

The *Sawyer* standard has a broader application than is at first apparent. As the Court explained in *Schlup,* when a capital petitioner challenges his underlying capital murder conviction on the basis of an element that "function[s] essentially as a sentence enhancer," the *Sawyer* "clear and convincing" standard applies to the claim. *Schlup, supra,* at 326. Thus, to the extent a capital petitioner claims he did not kill the victim, the *Schlup* "more likely than not" standard applies. To the extent a capital petitioner contests the special circumstances rendering him eligible for the death penalty, the *Sawyer* "clear and convincing" standard applies, irrespective of whether the special circumstances are elements of the offense of capital murder or, as here, mere sentencing enhancers.

A claim like Thompson's could present some difficulty concerning whether to apply *Schlup* or *Sawyer.* Thompson makes no appreciable effort to assert his innocence of Fleischli's murder. Instead, he challenges, first, his rape conviction, and second, the jury's finding of the special circumstance of rape. The former challenge is subject to the *Schlup* "more likely than not" standard; the latter challenge is subject to the *Sawyer* "clear and convincing" standard. In theory, then, it would be possible to vacate Thompson's stand-alone conviction of rape but to let stand his conviction of murder and sentence of death. This anomaly perhaps reflects some tension between *Sawyer* and the later decided *Schlup.* The anomaly need not detain us, however, for Thompson's claims fail under either standard.

At trial, the prosecution presented ample evidence to show Thompson committed the rape. A vaginal swab of Fleischli's body revealed semen consistent with Thompson's blood type. App. 109. In addition, there was extensive evidence

of restraint consistent with rape. Dr. Robert Richards, a pathologist who performed the autopsy on Fleischli and testified for the prosecution at trial, stated that, at or near the time of death, Fleischli suffered a crushing injury to her right wrist with surrounding bruising. *Id.*, at 9. Deputy Darryl Coder, who in his 23 years as a law enforcement officer had seen "hundreds" of handcuff injuries, testified the injury to Fleischli's right wrist was consistent with injuries caused by handcuffs, a pair of which were in Thompson's possession when he was arrested in Mexico. *Id.*, at 13, n. 9. Dr. Richards further testified that Fleischli had other bruises on her ankles, palms, left elbow, and left wrist, all of which were caused at or near the time of death. *Id.*, at 9, 10 Record 1619. Fleischli's shirt and bra had been cut down the middle and pulled down to her elbows, exposing her breasts and restraining her arms. App. 7, 109. Fleischli's mouth had been gagged with duct tape. 9 Record 1505, 11 *id.*, at 1772.

There was further evidence of rape. As Judge Kleinfeld noted in dissent, "Fleischli was murdered by Thompson, a fate more frequent among rape victims than friendly sex partners." 120 F. 3d, at 1073. Two jailhouse informants, though discredited to a substantial extent at trial, testified that Thompson had confessed the rape (as well as the murder) to them.

As the District Court observed, moreover, Thompson's own testimony "was devastating to his defense." App. 51. Contrary to the emphatic advice of trial counsel, Thompson chose to testify. The result was by all accounts a disaster for his claim that he did not rape or murder Fleischli. The prosecution got Thompson to admit he lied to police after his arrest, when he denied having sex with Fleischli. He also admitted having lied to police about Fleischli's whereabouts the night of the murder, telling them she had left his apartment with Kashani. When asked about this lie, Thompson replied, "Mr. Kashani seemed as likely a candidate [as] any-

body at that time." 18 Record 2378. He then presented his most recent, and perhaps most fantastic, account of the events of the night of the murder. Thompson testified that, after having consensual sex with Fleischli, he fell asleep and remained asleep while, not more than six feet away, someone else stabbed Fleischli five times in the head, wrapped her head and body with duct tape, two towels, a sheet, her jacket, a sleeping bag, and a rope, moved her body from the apartment, and scrubbed the carpet to remove her blood. The District Court found Thompson's testimony "was riddled with inconsistencies and outright falsehoods." App. 51. The District Court further stated: "Thompson's testimony no doubt affected the jury's verdict." *Id.*, at 51. The point is beyond dispute; since Thompson lied about almost every other material aspect of the case, the jury had good reason to believe he lied about whether the sex was consensual.

Thompson presents little evidence to undermine the evidence presented at trial. The en banc court based its decision only on the claims and evidence presented in Thompson's first petition for federal habeas relief. Had it considered the additional evidence or claims presented in Thompson's motion to recall the mandate, of course, its decision would have been subject to §2244(b). See *supra*, at 554. Hence the record of Thompson's first federal habeas petition will govern whether he has demonstrated actual innocence of rape.

The evidence in Thompson's petition falls into two categories. First, Thompson presented additional evidence to impeach the credibility of Fink and Del Frate, the jailhouse informants who testified Thompson confessed the rape and murder to them. In the case of Fink, Thompson presented additional evidence of Fink's history as an informant and of law enforcement favors for Fink. Thompson also presented statements by law enforcement officials to the effect that Fink was an unreliable witness. In the case of Del Frate, Thompson presented evidence that law enforcement officials

and certain members of Del Frate's family regarded Del Frate as dishonest, that Del Frate shared a jail cell with David Leitch prior to meeting Thompson, that Del Frate's statements to police tracked newspaper accounts of the crime, and that Del Frate neglected to mention at trial his prior convictions for grand theft and distribution of hallucinogens without a license.

This impeachment evidence provides no basis for finding a miscarriage of justice. As in *Sawyer*, the evidence is a step removed from evidence pertaining to the crime itself. 505 U. S., at 348. It tends only to impeach the credibility of Fink and Del Frate. To find that these matters in all probability would have altered the outcome of Thompson's trial, we should have to assume, first, that there was little evidence of rape apart from the informant's testimony; and second, that the jury accepted the informants' testimony without reservation. The former assumption is belied by the evidence recited above. The latter one is belied by the substantial impeachment evidence Thompson's attorney did introduce.

With regard to Fink, Thompson's trial counsel presented the following evidence: Fink had four prior felony convictions and had spent a total of 14 years in prison at the time of trial. He used heroin on a frequent basis during the 15 years preceding trial, including the period in which he gave his statement to police. He lied about his identity as a matter of routine. He acted as an informant on numerous other occasions, including one occasion where he informed on another inmate to gain protective custody in prison. He requested and received a transfer to another penal facility in exchange for his statement against Thompson. And he admitted being unable to explain why criminals confessed to him with such frequency.

With regard to Del Frate, Thompson's trial counsel presented the following evidence: Del Frate had served time for second-degree murder and credit card forgery. At the time

of trial, Del Frate faced felony charges in Ohio and California. Del Frate admitted claiming another murderer confessed to him during the period in which Thompson confessed to him. He also admitted changing his account of Thompson's confession to him numerous times. Given the trial evidence impeaching each informant, we would disrespect the jury in Thompson's case if we were to find that, had it been presented with still more impeachment evidence, it would have reached a different verdict.

In support of his first federal habeas petition, Thompson also presented the opinions of Dr. Irving Root, a pathologist who testified on Thompson's behalf during the evidentiary hearing in Federal District Court. Dr. Root disputed certain of the opinions offered by Dr. Richards and Deputy Coder at trial. First, Dr. Root disagreed with Deputy Coder's conclusion that the crushing injury to Fleischli's left wrist was caused by handcuffs. Dr. Root stated the injury was unlike handcuff injuries he had seen on other corpses. 1 Tr. 52–54, 62–63 (Aug. 5, 1997). He did not, however, offer any alternative explanation as to how the injury might have been caused. Second, Dr. Root disputed Dr. Richards' conclusions regarding the bruises on Fleischli's body. Dr. Root opined the bruises to Fleischli's ankles and left wrist were caused at least 11 hours before death. *Id.*, at 47–50. He further stated the bruises to Fleischli's palms were the result of lividity, *i. e.*, the settling of blood by gravity after death. *Id.*, at 48. Third, Dr. Root noted there had been "infrequent" sperm on the vaginal swab of Fleischli's body. *Id.*, at 63. Dr. Root suggested this finding could be the result of low sperm count for the male, or douching or drainage after intercourse. *Ibid.* He further suggested the other evidence in the case ruled out the possibility of drainage. *Id.*, at 63–64. He did not, however, opine as to whether low sperm count or douching was the more probable of the remaining possibilities. Finally, Dr. Root summarized his tes-

timony by agreeing "there was remarkably little in the way of trauma to the decedent's body." *Id.*, at 52.

Dr. Root's testimony provides no occasion for disturbing the findings of the jury in Thompson's case. His testimony that the crushing injury to Fleischli's wrist was not caused by handcuffs is far from compelling, given Deputy Coder's extensive experience with handcuff injuries (albeit with living persons) and Dr. Root's failure to offer any alternative explanation as to how the crushing injury might have occurred. His testimony that the other bruises to Fleischli's body were caused well before death is more plausible. Unlike Dr. Richards, however, Dr. Root based his conclusions not on his own examination of the body, but on his review of the record of Dr. Richards' examination. See *id.*, at 70. It is improbable, moreover, that Fleischli had been walking about with bruises all over her body, without any witness having noticed her condition in the days and hours before Thompson murdered her. As for the infrequent sperm on the vaginal swab, Dr. Root himself suggested the cause might have been low sperm count for the male, a possibility consistent with rape. *Id.*, at 63. Finally, Dr. Root's assessment of the overall trauma to the body was to a large extent consistent with Dr. Richards' testimony at trial. For instance, Dr. Richards testified there was no evidence of vaginal tearing or bruising in Fleischli's case, though he indicated (and Dr. Root did not dispute) there was no such evidence in the majority of rape cases. 10 Record 1629. As Dr. Root himself acknowledged, his conclusion that there was "remarkably little" trauma to Fleischli's body was lifted verbatim from Dr. Richards' own autopsy report in Fleischli's case. 1 Tr. 52 (Aug. 5, 1997).

To say that no reasonable juror would have convicted Thompson of rape if presented with Dr. Root's testimony, then, we would have to ignore the totality of evidence of Thompson's guilt. This we cannot do.

In conclusion, Thompson's evidence does not meet the "more likely than not" showing necessary to vacate his stand-alone conviction of rape, much less the "clear and convincing" showing necessary to vacate his sentence of death. The judgment of the State of California will not result in a miscarriage of justice. The Court of Appeals abused its discretion in holding the contrary.

## IV

The judgment of the Court of Appeals is reversed, and the case is remanded with instructions to reinstate the June 11, 1997, mandate denying habeas relief to Thompson.

*It is so ordered.*

JUSTICE SOUTER, with whom JUSTICE STEVENS, JUSTICE GINSBURG, and JUSTICE BREYER join, dissenting.

Like the majority, I accept the representation of the Court of Appeals that it was acting *sua sponte* in its decision to recall its previous mandate on August 3, 1997, a position supported by the record. On July 28, 1997, the panel denied respondent's motion to recall the mandate, which was an effort to seek whatever advantage he might obtain from newly discovered evidence, and during the en banc rehearing ultimately granted the court considered nothing beyond the record presented in respondent's first *habeas corpus* proceeding.

Even on my assumption that the Court of Appeals acted on its own and in the interest of the integrity of its appellate process, however, the timing of its actions is a matter for regret. The court has indicated that it chose to initiate consideration of a recall *sua sponte* shortly after this Court denied certiorari to review the appeals court's first judgment on June 2, 1997, 109 F. 3d 1358 (CA9), cert. denied, 520 U. S. 1259 (1997), but chose to take no immediate action in the interest of comity as between the state and federal systems.

The Court of Appeals accordingly refrained from acting on the merits until after the state courts had adjudicated a fourth state postconviction claim, the Governor of California had undertaken a comprehensive review of the case and had denied clemency, and the State had scheduled respondent's execution. As a consequence, the concern for comity that motivated the court came to look like hope that a state decisionmaker would somehow obviate the federal court's need to advertise its own mistakes and take corrective action.

But as unfortunate as the Court of Appeals's timing may have been, that is not the ground on which the majority reverses the judgment entered on the en banc rehearing. In rejecting the conclusion of the en banc court, the Court applies a new and erroneous standard to review the recall of the mandate, and I respectfully dissent from its mistaken conclusion.

Like the majority, I begin with the longstanding view that a court's authority to recall a mandate in order to correct error is inherent in the judicial power, *ante*, at 549–550 (citing *Hawaii Housing Authority* v. *Midkiff*, 463 U. S. 1323, 1324 (1983) (REHNQUIST, J., in chambers); *Hazel-Atlas Glass Co.* v. *Hartford-Empire Co.*, 322 U. S. 238, 249–250 (1944)), and subject to review only for abuse of discretion, *ante*, at 549. Although we have had no occasion to discuss the abuse standard as applied to actions of a court of appeals as distinct from those of a trial court, there is no reason to suppose the criterion should be affected merely because it is an appellate court that has exercised the discretionary power to act in the first instance. It is true, of course, that the variety of subjects left to discretionary decision requires caution in synthesizing abuse of discretion cases. See Friendly, Indiscretion About Discretion, 31 Emory L. J. 747, 762–764 (1982); Rosenberg, Judicial Discretion of the Trial Court, Viewed From Above, 22 Syracuse L. Rev. 635, 650–653 (1971). At the least, however, one can say that a high degree of deference to the court exercising discretionary authority is the

hallmark of such review. *General Electric Co.* v. *Joiner*, 522 U. S. 136, 143–147 (1997); *National Hockey League* v. *Metropolitan Hockey Club, Inc.*, 427 U. S. 639, 642 (1976) *(per curiam)*. Thus, in such a case as this one, deference may be accorded to any reasonable selection of factors as relevant to the exercise of a court's discretion (since the determination to recall is one for which criteria of decision have not become standardized), see *United States* v. *Criden*, 648 F. 2d 814, 818 (CA3 1981), and to the weighing of these factors in light of the particular facts, see *Lawson Prods., Inc.* v. *Avnet, Inc.*, 782 F. 2d 1429, 1437 (CA7 1986); 1 S. Childress & M. Davis, Federal Standards of Review § 4.21, p. 4–163 (2d ed. 1992) ("It could be said, then, that in run-of-the-mill discretionary calls, review applies differently by the context, facts, and factors, but that many times the actual level of deference boils down to one similar to that used for the clearly erroneous rule. As a general proposition, then, abuse of discretion deference is closer to a clear error test than to the jury review test of irrationality"); cf. *Citizens to Preserve Overton Park, Inc.* v. *Volpe*, 401 U. S. 402, 416 (1971) (explaining the standard of review under 5 U. S. C. § 706(2)(A), which requires agencies to make choices that are not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law"); *ibid.* ("To make th[e] finding [required under § 706(2)(A)] the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment"). The obligation of deference is only underscored here by the fact that the reason for the recall was to consider an en banc rehearing, a matter of administration for the Courts of Appeals on which this Court has been careful to avoid intrusion, see *Western Pacific Railroad Case*, 345 U. S. 247, 259, and n. 19 (1953).

The factors underlying the action of the Court of Appeals in this case were wholly appropriate, the court's stated justi-

fication having been to exercise extreme care to counter the malfunction of its own procedural mechanisms where the result otherwise might well be a constitutionally erroneous imposition of the death penalty. Indeed, the only serious question raised about the validity of such considerations goes to the legitimacy of employing en banc rehearings to correct a panel's error in the application of settled law. See 120 F. 3d 1045, 1069–1070 (CA9 1997) (Kozinski, J., dissenting). But however true it is that the en banc rehearing process cannot effectively function to review every three-judge panel that arguably goes astray in a particular case, surely it is nonetheless reasonable to resort to en banc correction that may be necessary to avoid a constitutional error standing between a life sentence and an execution. It is, after all, axiomatic that this Court cannot devote itself to error correction, and yet in death cases the exercise of our discretionary review for just this purpose may be warranted. See *Kyles* v. *Whitley*, 514 U. S. 419, 422 (1995); *id.*, at 455 (STEVENS, J., concurring).

To be sure, there lurks in the background the faint specters of overuse and misuse of the recall power. All would agree that the power to recall a mandate must be reserved for "exceptional circumstances," 120 F. 3d, at 1048; 16 C. Wright, A. Miller, & E. Cooper, Federal Practice and Procedure § 3938, pp. 716–717, n. 14 (1996) (citing cases from the various Courts of Appeals recognizing that the power must be used sparingly), in the interests of stable adjudication and judicial administrative efficiency, on which growing caseloads place a growing premium. All would agree, too, that the *sua sponte* recall of mandates could not be condoned as a mechanism to frustrate the limitations on second and successive habeas petitions, see, *e. g.*, 28 U. S. C. § 2244(b).[1] If

---

[1] The Ninth Circuit itself seems to recognize that a motion to recall the mandate filed by a petitioner subsequent to a previous request for federal habeas relief is analogous to a second or successive petition that is sub-

there were reason to suppose that the *sua sponte* recall would be overused or abused in either respect, we might well see its use as unreasonable in a given case simply to deter resort to it in too many cases. But as matters stand, we have no reason for such fears and no reason to circumscribe the Court of Appeals's response to its otherwise legitimate concerns. If history should show us up as too optimistic, we will have every occasion to revisit the issue.

Going from the legitimacy of the Court of Appeals's concerns to the reasonableness of invoking them on the facts here, I need mention only two points. The first arises on the question whether administrative mistakes in the chambers of only two judges could be seen as causing what the court saw as the threatened miscarriage of justice in permitting the execution of someone who was ineligible for death; two failures to vote for en banc review are not the cause of a miscarriage when the vote against such review is otherwise unanimous. Such at least is the math. But anyone who has ever sat on a bench with other judges knows that judges are supposed to influence each other, and they do. One may see something the others did not see, and then they all take another look. So it was reasonable here for the en banc court to believe that when only two judges mistakenly failed to vote for en banc rehearing, their misunderstandings could well have affected the result.

The only remaining bar to the application of the appeals court's policies to the facts of this case is said to be that the en banc court was mistaken in thinking the panel had committed error when it reversed the trial court's conclusion that ineffective assistance of counsel in the rape case had been prejudicial within the meaning of *Strickland* v. *Washington*, 466 U. S. 668, 693–694 (1984). But whether the en banc majority was correct on this question of law and fact is

---

ject to the constraints of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). See, *e. g., Nevius* v. *Sumner*, 105 F. 3d 453, 461 (CA9 1996).

not the issue here. The issue on abuse-of-discretion review is simply whether those voting to recall the mandate to allow en banc review could reasonably have thought the earlier panel had been mistaken, and the conclusions of the District Court suffice to answer yes to that question. See *Thompson* v. *Calderon*, Civ. No. 89–3630–RG (CD Cal., Mar. 29, 1995), reprinted at App. 14–16. The ultimate merit of either court's answer to the underlying question is not the touchstone of abuse-of-discretion review, see *National Hockey League*, 427 U. S., at 642 (under abuse-of-discretion review, the relevant question is not whether the reviewing court would have reached the same result), and here we review only for abuse, not the merits of the underlying case (the question whether prejudice should be found on the record of this case not warranting review).[2]

The majority, of course, adhere to the terminology of abuse of discretion in reversing the Ninth Circuit. But it is abuse of discretion "informed by" the 1996 amendments to the habeas corpus statute enacted by certain provisions of AEDPA, Pub. L. 104–132, 110 Stat. 1217, *ante*, at 558; see *Felker* v. *Turpin*, 518 U. S. 651 (1996), and as so informed the abuse-of-discretion standard is beyond recognition. That aside, the Court's reformulation is as unwarranted on the Court's own terms as it is by the terms of AEDPA.

---

[2] Abuse-of-discretion review of the likelihood of a miscarriage of justice is analogous to the abuse-of-discretion review of Rule 11 sanctions for frivolous filings. In that context, we held that reviewing courts should defer to district courts' conclusions about substantial legal justification. *Cooter & Gell* v. *Hartmarx Corp.*, 496 U. S. 384, 401–405 (1990). In the present circumstances, where the subject of our review for an abuse of discretion is an appellate court's conclusion that a threatened miscarriage of justice is sufficient to justify recalling the mandate, I believe that we similarly must give some deference to the Court of Appeals's preliminary analysis that there may have been a misapplication of a legal standard, even though we would not defer to it if we were addressing the ultimate question on the merits, whether a trial court had committed legal error.

Why AEDPA is thought to counsel review of recalls of mandates under anything but the traditional abuse-of-discretion standard is unexplained by anything in the majority opinion. The majority, like me, accepts the Court of Appeals's position that it was not covertly allowing respondent to litigate a second habeas petition; the majority assumes that the Ninth Circuit was acting on its own motion to recall the mandate, in order to allow reconsideration of the first habeas petition. *Ante,* at 554. On these assumptions, AEDPA has no application to the issue before us. Nothing in AEDPA speaks to the courts of appeals' inherent power to recall a mandate, as such, and so long as the power over mandates is not abused to enable prisoners to litigate otherwise forbidden "second or successive" habeas petitions, see 28 U. S. C. § 2244(b), AEDPA is not violated.

Nor are the policies embodied in AEDPA served by today's novelty. Section 2244(b) provides that if a claim raised in a second or successive petition was presented in a prior application, it shall be dismissed. I suppose that if the claim under en banc review were to bear analogy to anything covered by AEDPA, it would be to the previously raised claim covered by subsection (b)(1), since the claim reviewed en banc was the actual claim previously reviewed by the panel. And yet the majority does not draw any such analogy and does not dismiss on this basis. Subsection (b)(2) provides that when a second or successive petition raises a claim not previously presented, it too shall be dismissed unless based on a new and retroactive rule of constitutional law, § 2244(b)(2)(A), or based on previously undiscoverable evidence that would show to a clear and convincing degree that no reasonable factfinder would have convicted, considering all the evidence, had it not been for constitutional error, § 2244(b)(2)(B). Here, again, the majority fails to draw any analogy, for if reconsideration of a claim after *sua sponte* recall were thought to resemble a claim mentioned in subsection (b)(2), the majority would presumably require more than

it does today. In fact, the majority goes no further than to call for a showing of actual innocence sufficient for relief under our earlier cases, *ante*, at 557; yet as the Court realizes, our standard dealing with innocence of an underlying offense requires no clear and convincing proof, *ante*, at 560, see *Schlup* v. *Delo*, 513 U. S. 298, 327 (1995), and the Court would be satisfied with a demonstration of innocence by evidence "not presented at trial," *ante*, at 559, even if it had been discovered, let alone discoverable but unknown, that far back.

Whatever policy the Court is pursuing, it is not the policy of AEDPA. Nor is any other justification apparent. In this particular case, when all else is said, we simply face a recall occasioned by some administrative inadvertence awkwardly corrected; while that appellate process may have left some unfortunate impressions, neither its want of finesse nor AEDPA warrant the majority's decision to jettison the flexible abuse-of-discretion standard for the sake of solving a systemic problem that does not exist.