Neal GIRALDI, Petitioner,

v.

George BARTLETT, Superintendent, Elmira Correctional Facility, Respondent.

No. 95 Civ.7804(RMB).

United States District Court, S.D. New York.

Aug. 2, 2000.

Andrew A. Rubin, Mancuso, Rubin & Fufidio, White Plains, NY, for Plaintiffs.

John J. Sergi, Asst. D.A., District Attorney of Westchester County, White Plains, NY, for Defendants.

### ORDER

BERMAN, District Judge.

On September 13, 1995, Neal Giraldi ("Petitioner" or "Giraldi"), proceeding *pro*

*se,*[1] filed a petition for a writ of habeas corpus in the United States District Court for the Southern District of New York, pursuant to 28 U.S.C. § 2254, challenging his 1975 conviction in New York Supreme Court, Westchester County, for murder in the second degree, assault in the second degree, and possession of a weapon as a misdemeanor. Petitioner alleges three grounds for habeas relief: (i) deprivation of his due process rights by virtue of the trial court's jury instructions concerning his insanity defense; (ii) deprivation of his due process rights by virtue of the District Attorney's refusal to disclose certain alleged *Rosario* material; and (iii) deprivation of his Sixth Amendment rights by virtue of alleged ineffective assistance of his appellate counsel.[2] Petitioner's ineffective assistance of appellate counsel claim is a derivative of his first two claims: it is the alleged failure of his appellate counsel to raise on direct appeal the trial court's jury instructions on the insanity defense and the State's failure to disclose certain alleged *Rosario* material.[3]

In his Report and Recommendation dated December 11, 1996 (the "Report"), United States Magistrate Judge Leonard A. Bernikow recommended denial of Petitioner's first two claims (the due process challenges concerning jury instructions and failure to provide *Rosario* material). Yet, despite this recommendation as to Petitioner's first two claims, Magistrate Bernikow also determined that there had been ineffective assistance of appellate counsel.[4] He concluded "that the writ [should] be granted unless the state affords petitioner an opportunity to present his appeal to the appropriate New York State Court for consideration of the issues

1. Petitioner has since retained Andrew A. Rubin, Esq. as counsel in this matter.

2. On (direct) appeal to the Appellate Division, Second Department, Petitioner was represented by Jack S. Hoffinger, Esq. and Robert A. Goldschlag, Esq. (*See also* footnote 3, below).

3. At trial, Petitioner was also represented by Messrs. Hoffinger and Goldschlag, although **Petitioner has not claimed ineffective assistance of trial counsel.**

Mr. Hoffinger graduated from Yale Law School in 1951. He served as an Assistant District Attorney for almost five (5) years before entering private practice. (Transcript of Hearing dated May 16, 2000 ("Hearing Tr.") at 6). By the time of Petitioner's trial in 1975, Mr. Hoffinger had "tried a number of criminal cases" including "at least four murder cases." (Hearing Tr. at 6). Mr. Hoffinger has also been an active lecturer on criminal law issues. (Hearing Tr. at 25).

Mr. Goldschlag graduated from Brooklyn Law School in 1970 where he was "an editor of the law review." (Hearing Tr. at 41). Thereafter, he served in the Appeals Bureau at the District Attorney's Office for four (4) years where he handled "[e]xclusively criminal appeals", although he also "tried one or two cases on the side." (Hearing Tr. at 41). During his four years in the Appeals Bureau, Mr. Goldschlag estimates that he handled "in excess of a hundred" criminal appeals. (Hearing Tr. at 55). He joined Mr. Hoffinger's law firm in 1974. (Hearing Tr. at 41).

4. The instant case was initially assigned to U.S. District Judge Lewis A. Kaplan. In February 1996, Judge Kaplan referred the matter to Magistrate Bernikow. On or about December 23, 1996, the case was reassigned to U.S. District Judge John F. Keenan. Oral argument was held before Judge Keenan on January 27, 1997. On or about March 21, 1997, the case was reassigned to U.S. District Judge Sidney H. Stein and, on or about December 23, 1998, the case was reassigned to this Court.

Respondent's "Objections to Report and Recommendation of Magistrate Judge" ("Objections") were received and reviewed by Judge Keenan before the above mentioned January 27, 1997 oral argument. (*See* Keenan Transcript ("Keenan Tr.") dated January 27, 1997 at 2–3). Respondent's Objections are undated and were not formally filed with the Clerk's office until on or about June 10, 1999. Counsel for Petitioner, who was apparently retained sometime in late 1996 after the issuance of Magistrate Bernikow's Report, did not object to Magistrate Bernikow's Report, but submitted a letter to Judge Keenan dated January 9, 1997, as a "response to the respondent's objections" ("Response"). (Letter dated January 9, 1997 at 1). In addition to the Respondent's Objections and Petitioner's Response, both parties submitted additional letters to Judge Keenan both before and after the January 27, 1997 oral argument. They have each made several written submissions to this Court, including as recently as June 28, 2000.

concerning the jury instructions and the *Rosario* claim as if they were properly and timely presented, or, in the alternative, provides petitioner a new trial." (Report at 26–27).

**For the reasons set forth below, the Magistrate's Report is adopted in part and rejected in part.** Specifically, the Court accepts so much of the Report as recommends denial of Petitioner's two due process claims (with respect to the trial court's jury instructions and failure to provide *Rosario* material). The Court respectfully rejects so much of the Report as finds that there was ineffective assistance of appellate counsel. **The writ is, therefore, denied in its entirety.**

### Background

Following a jury trial in New York Supreme Court, Westchester County, on June 4, 1975 Petitioner was convicted of murder in the second degree, assault in the second degree, and possession of a weapon as a misdemeanor. The jury convicted Petitioner of stabbing to death Mrs. Elfredie Bernhardt ("Mrs. Bernhardt") at her home on January 17, 1974, and also of stabbing her five year old son, a cerebral spastic, in his legs.[5] Following the crimes, Petitioner turned himself into the police.[6]

At police headquarters on January 29, 1974, after being informed of his rights, Petitioner confessed to killing Mrs. Bernhardt.[7]

Petitioner told the police that he had had two drinks of scotch and water before driving to the Bernhardt residence prior to the murder. He denied that he had used drugs prior to the crime.[8] At trial, Petitioner again admitted that he had stabbed Mrs. Bernhardt, but claimed (for the first time) that he had taken two LSD tablets before driving to the Bernhardt residence. Indeed, a central issue at trial was whether Petitioner had taken LSD on the day of the murder and, if so, what effect (legally and psychologically) the LSD had on Petitioner's mental state.[9] On July 7, 1975, Petitioner was sentenced to a term of imprisonment of twenty-five years to life, with concurrent lesser terms imposed for the assault and weapons charges.

In August 1976, Petitioner filed the first of several state appeals. Petitioner raised five issues on direct appeal. First, he argued that the jury's finding that his sanity had been proven beyond a reasonable doubt was not supported by the evidence. Second, he challenged the trial court's refusal to instruct the jury that

5. Mrs. Bernhardt was stabbed five times. (Trial Transcript ("Trial Tr.") at 357). The cause of death, according to the Associate Medical Examiner of Westchester County, was "stab wounds of the anterior thoracic wall, anterior abdominal wall and left arm, penetrating the heart, liver, inferior vena cava and aorta, hemorrhage and shock." (Trial Tr. at 362). Mrs. Bernhardt's son had "two rather deep lacerations, one on the left knee about six inches long and the other on the upper portion of the right lower leg about two inches long," (Trial Tr. at 384), requiring "about 28" sutures. (Trial Tr. at 385). The police found Mrs. Bernhardt "lying in a pool of blood," (Trial Tr. at 86), with "no clothing from the waist down." (Trial Tr. at 87). The police found Mrs. Bernhardt's son strapped to a bed with blood "all over" it. (Trial tr. at 89).

6. Immediately after the crimes. Petitioner had dinner with his girlfriend, Gail Paradiso, and her parents. (Trial Tr. at 153). Soon thereafter, Petitioner and Ms. Paradiso sat down to watch television and do word puzzles. (Trial Tr. at 154).

7. Petitioner's detailed confession constitutes 42 pages of the trial transcript. (Trial Tr. at 309–351). He denied stabbing Mrs. Bernhardt's son.

8. When asked whether he used marihuana or drugs, Petitioner answered, "'A long time ago, but not anymore.'" (Trial Tr. at 315).

9. At trial, the defense strategy was predicated on the argument that Giraldi suffered from temporary insanity triggered by the ingestion of LSD. And, in their brief on direct appeal to the Appellate Division, Second Department, appellate counsel stated that "[t]he defense was predicated upon expert psychiatric testimony that the appellant suffered from temporary insanity triggered by the ingestion of LSD." (Petitioner's Brief on Direct Appeal dated August 1976 at 26).

LSD "intoxication" was a (complete) defense if it rises to the level of insanity. Third, he claimed that a number of rulings made by the trial court denied him a fair trial, including, in particular, various *Rosario* rulings. Fourth, he challenged the trial court's jury instruction that he had the burden of proving the affirmative defense of extreme emotional distress. Fifth, he claimed that his sentence was excessive.

Petitioner's conviction was (unanimously) affirmed, without opinion, by the Appellate Division, Second Department on December 6, 1976. *See People v. Giraldi*, 55 A.D.2d 858, 390 N.Y.S.2d 768 (N.Y.App. Div.1976). Leave to appeal was denied by the New York State Court of Appeals on January 24, 1977. *See People v. Giraldi*, 41 N.Y.2d 866, 393 N.Y.S.2d 1033, 362 N.E.2d 631 (1977).

In 1991, almost fifteen years after his conviction was affirmed by the Appellate Division, Petitioner moved in the Appellate Division for a writ of error coram nobis asserting, as he does here, ineffectiveness of appellate counsel (based on the same alleged omissions of counsel that are raised in the instant petition).[10] The Appellate Division denied the coram nobis motion, ruling that Petitioner **"had not established that retained counsel rendered ineffective assistance in connection with his 1976 appeal."** (Decision & Order on Motion dated November 21, 1991)(emphasis added).

In 1993, Petitioner, proceeding *pro se*, moved in the Appellate Division to recall and vacate the 1976 decision affirming his conviction. The grounds Petitioner asserted before the Appellate Division in 1993 were the same as those asserted here (i.e., the trial court's allegedly erroneous jury instructions concerning his insanity defense and the District Attorney's refusal to produce certain alleged *Rosario* material). Petitioner did not assert a claim for ineffective assistance of counsel. On August 4, 1993, the Appellate Division denied Petitioner's motion. (Decision & Order on Motion dated August 4, 1993).

The instant petition followed two years later.[11]

By Order dated April 20, 2000, the Court directed that a hearing be held for the purpose of receiving "evidence on the following issues, among others: (i) Appellate Counsel's reasoning for not raising on appeal the trial court's allegedly erroneous jury instruction on insanity, and (ii) Appellate Counsel's reasoning for not raising on appeal the trial court's failure to direct the District Attorney to turn over to the defense certain alleged *Rosario* material, i.e., summaries of the statements of certain witnesses." (Order dated April 20, 2000 at 1–2). *See, e.g., McKee v. United States*, 167 F.3d 103, 108–09 (2d Cir.1999)(remanding to District Court because there was "no indication that [petitioner's] first appellate counsel was afforded an opportunity to be heard and to present evidence regarding his reason for not challenging the district court's reasonable-doubt in-

---

**10.** On his writ of error coram nobis appeal, Petitioner was represented by Samuel F. Prato, Esq. and Frank A. Aloi, Esq. " 'Writ of error coram nobis' is a procedural tool whose purpose is to correct errors of fact only, and its function is to bring before the court rendering the judgment matters of fact which, if known at the time judgment was rendered, would have prevented its rendition." *Black's Law Dictionary* 337 (6th ed.1990).

**11.** This Court held a conference with the parties on February 9, 1999, and requested additional briefing. After reviewing Petitioner's letter brief dated March 9, 1999, and Respon-

dent's letter brief dated March 29, 1999, the Court held oral argument on April 16, 1999. Thereafter, the parties submitted supplemental letters to the Court in July and September of 1999.

It should be noted that Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which amended § 2254 and related provisions, does not apply to Petitioner's habeas petition, which was filed before the AEDPA's effective date of April 24, 1996. *See Smith v. Robbins*, —— U.S. ——, 120 S.Ct. 746, 754 n. 3, 145 L.Ed.2d 756 (2000).

structions on the direct appeal"). The hearing was conducted on May 16, 2000.[12] The parties filed post-hearing briefs which were received in Chambers on June 28, 2000.

### Standard of Review

■■■ If no written objections are filed, a District Judge need only satisfy himself that there is no clear error on the face of the record. *See* 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72(b); *Heisler v. Kralik,* 981 F.Supp. 830, 840 (S.D.N.Y.1997), *aff'd,* 164 F.3d 618, 1998 WL 636985 (2d Cir.1998). When timely objections are made to a Magistrate's report, the District Judge must make a *de novo* determination, but is not required to conduct a *de novo* hearing. *See, e.g., East River Sav. Bank v. Secretary of Housing and Urban Development,* 702 F.Supp. 448, 453 (S.D.N.Y.1988). Once objections are received, a District Judge may accept, reject, or modify, in whole or in part, the findings and recommendations of the Magistrate. *See DeLuca v. Lord,* 858 F.Supp. 1330, 1345 (S.D.N.Y.1994), *aff'd,* 77 F.3d 578 (2d Cir. 1996); *Walker v. Hood,* 679 F.Supp. 372, 374 (S.D.N.Y.1988); *East River Sav. Bank,* 702 F.Supp. at 453.

**Neither party has objected to Magistrate Bernikow's recommendations of denial of Petitioner's (two) due process challenges (i.e., relating to the trial court's jury instructions concerning the insanity defense and the District Attorney's refusal to disclose certain alleged *Rosario* material).** Respondent, however, has objected to Magistrate Bernikow's conclusion, with respect to Petitioner's claim of ineffective assistance of appellate counsel, that Petitioner should be entitled to present an appeal to an appropriate New York State court or be granted a new trial.

The Court has undertaken a *de novo* review of the entire Report and of the record upon which it is based. *See Simpkins v. Bellevue Hospital,* 832 F.Supp. 69, 70 (S.D.N.Y.1993)("[a]lthough not required under Fed.R.Civ.P. 72, the court conducted a de novo review of the Report"). Having undertaken a *de novo* review, the Court adopts the Report in so far as it recommends denial of Petitioner's due process challenges to the trial court's jury instructions and the failure to provide alleged *Rosario* material.[13] This recommendation is consistent with the record and applicable case law. However, for the reasons discussed below, the Court respectfully disagrees with Magistrate Bernikow's analysis and conclusions concerning Petitioner's claim for ineffective assistance of appellate counsel. The Court finds that Magistrate Bernikow made several substantial errors of fact and law in assessing

---

12. Among other things, the Court believes it was error for Magistrate Bernikow to issue his Report without first conducting such a hearing and giving appellate counsel the opportunity to be heard. Both Mr. Hoffinger and Mr. Goldschlag testified at the hearing on May 16, 2000. Petitioner was present and represented by his attorney, Andrew A. Rubin. Respondent was represented by John J. Sergi of the Westchester County District Attorney's Office. William Fredreck, Esq., the Assistant District Attorney who prosecuted Giraldi at trial in 1975, was unable (for health reasons) to appear at the hearing. (Hearing Tr. at 13–14). The parties, on consent, submitted a Stipulation dated June 19, 2000, setting forth Mr. Fredreck's testimony. *See* Stipulation dated June 19, 2000.

13. While Magistrate Bernikow (correctly) ruled that Petitioner was not denied due process concerning the jury instructions or the *Rosario* issue, he, nevertheless, (incorrectly) determined that appellate counsel were ineffective for allegedly not raising these exact claims on direct appeal. Magistrate Bernikow found that the jury instruction **"did not so affect the trial that the conviction violated due process."** (Report at 24)(emphasis added). He also found that Petitioner's *Rosario* claim **"is grounded in state law and is not reviewable on a federal habeas petition."** Report at 26 (emphasis added). At the same time, Magistrate Bernikow effectively countenanced an "end run" around his determinations by allowing Petitioner to pursue both these claims under the rubric of ineffective assistance of appellate counsel.

Petitioner's claim for ineffective assistance of appellate counsel.

### *Analysis*

#### The *Strickland* Test

■ In order to prevail on a claim for ineffective assistance of counsel under *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), a habeas petitioner must satisfy a two-part test. First, petitioner must show that his attorney's performance "fell below an objective standard of reasonableness." *Id.* at 688, 104 S.Ct. 2052. Second, petitioner must demonstrate that there is a "reasonable probability" that, but for counsel's error, "the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. 2052.[14] While the *Strickland* test was formulated in the context of evaluating a claim for ineffective assistance of trial counsel, the same test is used to assess claims pertaining to appellate counsel.

■ In his Report, Magistrate Bernikow failed to consider that "the purpose of the effective assistance guarantee of the Sixth Amendment is not to improve the quality of legal representation ... the purpose is simply to ensure that criminal defendants receive a fair trial." *Id.* at 689, 104 S.Ct. 2052. A review of the record here demonstrates that Petitioner did receive a fair trial. Indeed, he received a vigorous and (at least) objectively reasonable defense, both at trial and on appeal, from competent counsel. Though Petitioner was unsuccessful at trial and on appeal, this it seems clear was due to the overwhelming evidence against Petitioner (including his detailed confession), rather than the alleged ineffectiveness of (appellate) counsel. After a thorough review of the record, the Court concludes there can

be little doubt that the "adversarial testing process" worked in this case. *Id.* at 690, 104 S.Ct. 2052.

#### Judicial Scrutiny of Counsel's Performance Is Highly Deferential

■ Magistrate Bernikow's review of appellate counsel's performance was not "highly deferential," as it should have been. *Strickland,* 466 U.S. at 689, 104 S.Ct. 2052. The Magistrate conducted no hearing affording appellate counsel the opportunity to be heard. *See McKee,* 167 F.3d at 108–09. The Report provides no indication that Magistrate Bernikow recognized "that counsel is strongly presumed to have rendered adequate assistance ..." *Strickland,* 466 U.S. at 690, 104 S.Ct. 2052. In *Strickland,* the Supreme Court explained that:

> It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable.... A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge **a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance ...**

*Id.* at 689, 104 S.Ct. 2052 (emphasis added). The Supreme Court went on to warn that:

---

**14.** The U.S. Court of Appeals for the Second Circuit has stated that to establish prejudice in the appellate context, a petitioner must demonstrate that "there was a 'reasonable probability' that [his] claim would have been successful before the [state's highest court]." *Claudio v. Scully,* 982 F.2d 798, 803 (2d Cir. 1992), *cert. denied,* 508 U.S. 912, 113 S.Ct.

2347, 124 L.Ed.2d 256 (1993). *See* discussion on page 5, below, regarding the Appellate Division's ruling that Petitioner "had not established that retained counsel rendered ineffective assistance in connection with his 1976 appeal." (Decision & Order on Motion dated November 21, 1991).

The availability of intrusive post-trial inquiry into attorney performance or of detailed guidelines for its evaluation would encourage the proliferation of ineffectiveness challenges. Criminal trials resolved unfavorably to the defendant would increasingly come to be followed by a second trial, this one of counsel's unsuccessful defense.

*Id.* at 690, 104 S.Ct. 2052.

Here, Petitioner was convicted at trial based upon overwhelming evidence of guilt, including his own detailed confession. (Trial Tr. at 309–51).[15] Adoption of Magistrate Bernikow's recommendation would render the Supreme Court's "highly deferential" standard virtually meaningless.

**Undue Delay**

■ Magistrate Bernikow also failed adequately (if at all) to take into consideration the presumption of prejudice stemming from the substantial delay in filing the instant petition, i.e., nineteen (19) years after the Appellate Division's affirmance of Petitioner's conviction in 1976.

The Rules Governing Section 2254 Cases in the United States District Courts provide that:

**Delayed Petitions.** A petition may be dismissed if it appears that the state of which the respondent is an officer has been prejudiced in its ability to respond to the petition by delay in its filing unless the petitioner shows that it is based on grounds of which he could not have had knowledge by the exercise of reasonable diligence before the circumstances prejudicial to the state occurred.

Rule 9(a) of the Rules Governing Section 2254 Cases in the United States District Court. According to the Advisory Committee Notes to Rule 9:

This rule is intended to minimize abuse of the writ of habeas corpus by limiting the right to assert stale claims ... **Subdivision (a)** provides that a petition attacking the judgment of a state court may be dismissed on the grounds of delay if the petitioner knew or should have known of the existence of the grounds he is presently asserting in the petition and the delay has resulted in the state being prejudiced in its ability to respond to the petition. If the delay is more than five years after the judgment of conviction, prejudice is presumed, although this presumption is rebuttable by the petitioner.

... The grounds most often troublesome to the courts are ineffective assistance of counsel ...

■ The instant habeas petition, as noted, was filed in 1995, some nineteen years after Petitioner's conviction was affirmed by the Appellate Division. While this delay of almost two decades does not bar the instant habeas petition, it (should) be taken into account in ruling on Petitioner's application for collateral relief. *See Benn v. Stinson,* 917 F.Supp. 202, 208 n. 7 (S.D.N.Y.1995).[16]

**15.** As noted, Petitioner's conviction was unanimously affirmed by the Appellate Division Thereafter, leave to appeal was denied by the New York Court of Appeals. In 1991, almost fifteen years after his conviction was affirmed by the Appellate Division, Petitioner, with the aid of new counsel, moved in the Appellate Division for a writ of error coram nobis raising the same ineffective assistance of counsel arguments as are raised here. The Appellate Division denied the motion. In 1993, Petitioner moved in the Appellate Division to recall and vacate the 1976 decision that affirmed his conviction. The Appellate Division denied Petitioner's motion.

**16.** In a letter to District Judge Keenan, dated January 9, 1997, counsel for Petitioner attempted to justify Petitioner's lengthy delay in raising the issue of ineffective assistance of appellate counsel by arguing that "prior to 1987 there was no available [New York State] remedy for the petitioner. The New York Court of Appeals, in *People v. Bachert,* 69 N.Y.2d 593, 516 N.Y.S.2d 623, 509 N.E.2d 318 (1987), first approved the use of a writ of coram nobis for a claim of ineffective assistance of appellate counsel stating that the proper forum in such case is the appellate court where the alleged deficiency occurred." (Letter dated January 9, 1997). This argument is not persuasive. For one thing, when Petitioner availed himself of the coram nobis

In *Honeycutt v. Ward,* 612 F.2d 36 (2d Cir.1979), *cert. denied,* 446 U.S. 985, 100 S.Ct. 2969, 64 L.Ed.2d 843 (1980), the Court of Appeals for the Second Circuit reversed the judgment of the District Court which had granted a writ of habeas corpus. The *Honeycutt* court based its ruling, in large part, upon petitioner's undue delay in filing his habeas petition under Rule 9. The procedural history in *Honeycutt* was similar to the instant case in that:

> After bringing several ... petitions in the New York courts, Honeycutt challenged the use of the Oklahoma conviction as a predicate felony in a Coram nobis application, which was denied by the Supreme Court, New York County, on March 3, 1976. On August 5, 1976, leave to appeal was denied by the Appellate Division, First Department, as was leave to appeal from the Appellate Division's ruling on September 23, 1976, by the New York Court of Appeals. Subsequently, [on May 16, 1978] Honeycutt commenced the instant habeas corpus proceeding, claiming that the most ancient of his convictions the 1949 Oklahoma conviction was obtained in violation of his Sixth Amendment right to counsel and that, therefore, he should not have been sentenced as a fourth felony offender in 1954.

*Id.* at 38–39.

Though the grounds for relief in *Honeycutt* were somewhat different than those in the instant case, the issue of delay in seeking habeas relief is similar. "While it is important that one convicted of crime in violation of constitutional principles should be accorded relief, it is also important that reasonable diligence be required in order that litigation may one day be at an end." *Id.* at 42. In his concurring opinion in *Honeycutt,* Judge Friendly stated that "[i]t has long 'been recognized that the lapse of time affects the quantum of required proof as well as the good faith and credibility of the moving party.'" *Id.* at 43 (Friendly, J., concurring) (citation omitted). Judge Friendly also specifically noted "[b]ecause of the failure of the district judge to give appropriate weight to this principle ... the court's conclusion that Honeycutt did not have the assistance of counsel cannot stand." *Id.* In the instant case, Magistrate Bernikow failed to give appropriate weight to this principle. In fact, he apparently gave it no weight at all.

**Petitioner Was Convicted Based On Overwhelming Evidence of Guilt**

 At the time Petitioner first raised the issue of ineffective assistance of appellate counsel (i.e., in his 1991 motion for a writ of error coram nobis), the District Attorney's memorandum of law in opposition countered with a detailed showing that Petitioner was convicted of murder and assault based upon overwhelming evidence.[17] Among other evidence, prior to his arrest, Petitioner confessed to both his girlfriend, Gail Paradiso (Trial Tr. at

procedure in 1991, his claim for ineffective assistance of appellate counsel was rejected by the Appellate Division. The Appellate Division held that Petitioner **"had not established that retained counsel rendered ineffective assistance in connection with his 1976 appeal."** (Decision & Order on Motion dated November 21, 1991)(emphasis added). Second, even if there were no New York State mechanism to assert ineffective assistance of appellate counsel prior to the *Bachert* decision in 1987, Petitioner could have filed his habeas petition in Federal court (at any time). Petitioner, nevertheless, waited from 1987 to 1991 to bring his writ of error coram nobis in the Appellate Division. Third, it is unclear that prior to *Bachert* there was "no available

[New York State] remedy for the petitioner." For example, in *People v. Ramos,* 108 A.D.2d 209, 488 N.Y.S.2d 762 (1985), the Appellate Division, Second Department, analyzed the question of what procedure should be used to litigate a claim for ineffective assistance of appellate counsel and held that "[t]he basic approaches are either a motion for reargument or a vacatur of judgment by the trial court to permit a fresh appeal.... we think that a motion to vacate in the trial court is the best approach."

**17.** This is also supported by a review of the trial transcript which the Court has undertaken.

167)[18], and to his childhood friend, James Capozi, that he had killed Mrs. Bernhardt. (Trial Tr. at 224).[19] Upon his arrest, and after being apprised of his *Miranda* rights, Petitioner made a lengthy confession to the police, admitting that he stabbed Mrs. Bernhardt. (Trial Tr. at 309–51).[20] After making the confession, Petitioner telephoned his mother in Florida and told her that he had killed Mrs. Bernhardt. (Trial Tr. 412–14). Many of the details of Petitioner's confession were corroborated by the testimony witnesses as well as the physical evidence obtained at the crime scene.[21]

At the hearing conducted by this Court on May 16, 2000, Mr. Hoffinger, who, as noted, served as Giraldi's principal trial counsel in 1975, stated that:

> The evidence against Mr. Giraldi, in terms of what occurred, was quite bad. By that I mean, what we were confronted with was not only the stabbing, and I believe it was multiple stabbing, of a woman who was in her late 30's, I believe, Elfredie Bernhardt, ... in her driveway, where she had apparently no underclothes, her underclothes were found in the house, but complicating that event—— which was bad enough, because here we had a woman who was presumably defending her home, it looked like, and maybe defending her own honor—— but complicating the matter was the slashing of the legs of a brain-damaged child, a 5–year–old child, a boy.

(Hearing Tr. at 10).

It appears to this Court that the evidence of guilt was overwhelming and that trial counsel had a very weak case. Indeed, the evidence suggested that, as a matter of fact, Petitioner had not taken LSD (shortly) before committing the crime. In his confession to the Irvington police, when asked whether he used "marijuana or drugs," Petitioner answered "A long time ago, but not anymore." (Trial Tr. at 315).[22] Similarly, in his confessions to his girlfriend Gail Paradiso, to his friend James Capozi and to his mother, Petitioner never mentioned that he had taken or was under the influence of LSD when he killed Mrs. Bernhardt. Gail Paradiso testified that when she saw Petitioner at 6:15 p.m.—only 2 ½ hours after he allegedly took two tablets of LSD and **approximately one hour and fifteen minutes after he killed Mrs. Bernhardt**—his actions appeared to be quite rational (Trial Tr. at 195). At about 6:30 p.m.—the same evening of the murder—Ms. Paradiso and Petitioner had dinner with Ms. Paradiso's parents. (Trial Tr. at 153). Soon thereafter, at approximately 7 p.m., she and Petitioner sat down to watch television and do

18. At trial, Gail Paradiso testified as follows: "[Petitioner] followed me into the bedroom, and I sat down on the bed and he sat down next to me, and I looked over at him, and he gave me this wierd [sic] look, and I said to him, 'You killed that lady in Irvington, didn't you?' and he said—— he shook his head yes, and then I said 'Why? Did you think it was your father's girlfriend?' He said yes." (Trial Tr. at 167).

19. At trial, James Capozi testified as follows: "[Petitioner] was kind of depressed and you know, I kept asking him what's the matter, what's the matter. He told me—— he said 'I did something I thought I'd never do. I stabbed and killed a woman.'" (Trial Tr. at 224).

20. In his confession, Petitioner stated, among other things, the following:

Question: What did you ask her [Mrs. Bernhardt]?
Answer: About my father. And she said she never even heard of my father. I just got mad and went to the kitchen and took a knife.
Question: And then what happened?
Answer: I stabbed her.
(Trial Tr. at 310–11).

21. At trial, Petitioner again admitted that he had killed Mrs. Bernhardt, but this time he put forth a defense of insanity based on his alleged use of LSD shortly before the crime. Petitioner testified that he had ingested two tablets of LSD at approximately 3:40 p.m. (Trial Tr. 516–17). The murder occurred at approximately 5:00 p.m. (Trial Tr. at 5, 312).

22. As noted, Petitioner told the police that he had two drinks of scotch and water at 3:30 or 3:45 p.m. (Trial Tr. at 315).

word puzzles, which required the unscrambling of letters to form words based on certain clues. (Trial Tr. at 154). The District Attorney's psychiatric expert, Dr. A. Leonard Abrams, testified that "[i]t's my opinion that [Petitioner] was not on [LSD] at the time of the incident." (Trial Tr. at 810).[23] In sum, the evidence suggests that Petitioner's (belated) claim that he took LSD prior to killing Mrs. Bernhardt was suspect and that one of the central issues at trial was Petitioner's own credibility.

Magistrate Bernikow's Report does not acknowledge that the overwhelming evidence of Petitioner's guilt militates against granting habeas relief. *See Billy–Eko v. United States,* 8 F.3d 111, 118 (2d Cir.1993)("[m]oreover, the evidence against Billy–Eco was overwhelming, mitigating any error in the admission of the 1968 undocumented employment"), *superseded by statute on other grounds as noted in, Triestman v. U.S.,* 124 F.3d 361, 369 n. 8 (2d Cir.1997); *Williams v. Walker,* 1993 WL 22128 at *6 (S.D.N.Y. Jan.26, 1993)("we do not believe that defendant demonstrated the requisite prejudice under Strickland, for it is inconceivable to this Court—considering the strength of the government's case and the complete absence of corroborating evidence that petitioner was intoxicated—that petitioner would have been acquitted had he offered a defense of intoxication"). *See generally Calderon v. Thompson,* 523 U.S. 538, 554–55, 118 S.Ct. 1489, 140 L.Ed.2d 728 (1998)("In light of 'the profound societal costs that attend the exercise of habeas jurisdiction,' we have found it necessary to impose significant limits on the discretion of federal courts to grant habeas relief.... These limits reflect our enduring respect for 'the State's interest in the finality of convictions that have survived direct review within the state court system.' ") (citations omitted).

### Appellate Counsel Made Several Non-frivolous Arguments on Appeal

 Magistrate Bernikow also failed to acknowledge that Messrs. Hoffinger and Goldschlag filed a thorough and professional direct appeal on Giraldi's behalf in 1976.[24] It is well settled that "[e]very non-frivolous claim need not be urged if 'counsel, as a matter of professional judgment, decides not to present those points.' " *Abdurrahman v. Henderson,* 897 F.2d 71, 74 (2d Cir.1990)(quoting *Jones v. Barnes,* 463 U.S. 745, 751, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983)). *See also Robbins,* 120 S.Ct. at 765 (appellate counsel "need not (and should not) raise every nonfrivolous claim ..."). Although the Supreme Court has cautioned that judges should not impose on "counsel a duty to raise every 'colorable' claim ...," *Jones,* 463 U.S. at 754, 103 S.Ct. 3308, Magistrate Bernikow did not follow this admonition.

Indeed, appellate counsel raised on appeal the core defense issues from Petitioner's trial— including, among others, the issues of LSD ingestion, intoxication, and insanity. **They argued that the jury's finding that Petitioner's sanity had been proven beyond a reasonable doubt was not supported by the evidence. They**

---

23. Dr. Abrams also testified that "LSD is the most significant hallucinogenic [sic] drug and there is no indication at all from any information that I have that [Petitioner] was hallucinating." (Trial Tr. at 811).

24. At the hearing conducted by the Court on May 16, 2000, Mr. Goldschlag, who served as Giraldi's lead appellate counsel, testified that Petitioner's case on appeal was "weak." (Hearing Tr. at 44). Mr. Goldschlag also testified that it was his practice and procedure "to read the [trial] transcript from cover to cover, to make notes, to make notes not just with respect to those issues which were highlighted by an objection, but to make notes of issues that I felt, based upon my experience, were something that I should consider." (Hearing Tr. at 56). Mr. Goldschlag went on to explain that it was his practice and procedure "to read each and every case cited by my adversary and make a determination about whether there was anything in there that was worth dealing with or that was appropriate to deal with in my reply brief." (Hearing Tr. 61).

challenged the trial court's refusal to instruct the jury that intoxication is a defense if it rises to the level of insanity.[25] They claimed that a number of erroneous rulings—including some which concerned *Rosario* issues—were made throughout the trial and denied Petitioner a fair trial. They challenged the trial court's jury instruction that Petitioner had the burden of proving the affirmative defense of extreme emotional distress. And, they claimed that Petitioner's sentence was excessive.[26]

In his Report, Magistrate Bernikow states (erroneously in this Court's view) that "the claims raised by appellate counsel were weak and thus reduced his effectiveness." (Report at 10). **This sweeping statement is flatly contradicted by the record.** Moreover, the Report itself only specifically addresses two of the five arguments made by appellate counsel. (Report at 10–12). It fails to address (much less challenge) the merits of appellate counsels' three other arguments. Thus, Magistrate Bernikow's failure to confront the merit of the first, second and fifth arguments raised by appellate counsel undermines his conclusions. The first and second arguments contained in appellate counsels' direct appeal, which focused on Petitioner's

intoxication/insanity defense, go to the very heart of defense counsels' trial strategy.

> "One of the first tests of a discriminating advocate is to select the question, or questions, that he will present orally. Legal contentions, like the currency, depreciate through over-use. The mind of an appellate judge is habitually receptive to the suggestion that a lower court committed an error. But receptiveness declines as the number of assigned errors increases. Multiplicity hints at lack of confidence in any one.... **[E]xperience on the bench convinces me that multiplying assignments of error will dilute and weaken a good case and will not save a bad one.**"

*Jones*, 463 U.S. at 752, 103 S.Ct. 3308 (quoting Jackson, *Advocacy Before the Supreme Court*, 25 Temple L.Q. 115, 119 (1951))(emphasis added).[27]

Even if one were to assume that Magistrate Bernikow was correct that appellate counsels' third and fourth arguments were "weak," the fact that appellate counsel raised (at least) three strong (additional) arguments on appeal would amply demonstrate that their performance was well

25. In their brief on direct appeal, appellate counsel argued that "At the conclusion of the trial the judge charged the jury that voluntary intoxication was not a defense to crime but could be considered on the question of intent. The Court refused defense counsel's request to charge that intoxication which triggers insanity is a defense. The Court's instructions, and refusal to charge, were egregious error. The defense was predicated upon expert psychiatric testimony that the appellant suffered from temporary insanity triggered by the ingestion of LSD. The Court's charge instructed the jury to disregard that testimony, thereby depriving the appellant of his entire defense." (Petitioner's Brief on Direct Appeal dated August, 1976 at 26).

At the hearing before this Court on May 16, 2000, Mr. Goldschlag testified that this argument "set forth the heart of the appeal, which was also the heart of the trial, and that is the Court erred in its instruction with respect to intoxication and the voluntary ingestion of intoxicants and how that would have affected

the defense of insanity." (Hearing Tr. at 45)(emphasis added).

26. On appeal, appellate counsel filed a 37 page brief and a 4 page reply brief on behalf of Petitioner.

27. Mr. Hoffinger, at the hearing on May 16, 2000, stated that "My first boss was [now United States District Judge] Whitman Knapp.... Whitman Knapp's mantra to me was, on something on which I worked for him in the First Circuit, that a good appeal is an appeal where you pick the point that is critical and you don't bother with everything else. Maybe you put a few points in your brief, but when you do an appeal, you argue one point.... We had only one point in this case. We had nothing else. **The point was that LSD triggered a state of insanity, but nothing else....** If we couldn't win on that point, to be quite candid, we couldn't win on anything." (Hearing Tr. at 17–18)(emphasis added).

within the (wide) range expected of counsel. **The Court, however, vigorously disagrees with Magistrate Bernikow's assessment that appellate counsels' third and fourth arguments were weak.** These are addressed in reverse order.

With respect to Magistrate Bernikow's criticism of appellate counsels' **fourth** argument (i.e., that the trial court's jury instruction on the burden of proving the affirmative defense of extreme emotional distress was erroneous), the Report states:

> [Appellate counsel] argued, for example, citing *Mullaney v. Wilbur*, 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975), that it was unconstitutional to require petitioner to assume the burden of proving that he acted under the influence of extreme emotional disturbance.... The New York Court of Appeals, however, rejected that very argument in *Patterson*, 383 N.Y.S.2d at 581, 347 N.E.2d 898, which distinguished *Mullaney*, and counsel knew about that because he cited *Patterson* as a *contra* holding.... Thus, the argument had little chance of success.

(Report at 10). However, Magistrate Bernikow entirely failed to consider that, at the time appellate counsel submitted their brief to the Appellate Division, the New York Court of Appeals' (4 to 3) decision in *Patterson* was pending review by the United States Supreme Court. That the Supreme Court viewed the issue presented by appellate counsel as sufficiently meritorious to grant certiorari (and to later write extensively on the matter) suggests, if not demonstrates, that appellate counsel had good reason to raise it on direct appeal, Magistrate Bernikow's views notwithstanding. Indeed, Petitioner's counsel in the instant matter has essentially conceded this point. At oral argument before Judge Keenan on January 27, 1997, the following exchange occurred:

> [JUDGE KEENAN]: Mr. Rubin [Petitioner's counsel], what about the fact that really [appellate counsel] is damned if he does and damned if he doesn't? If he doesn't raise the affirmative defense issue and the constitutionality of it relating manslaughter in the first degree and extreme emotional disturbance at a point in time when Patterson is not the law yet for sure, and at a point in time when the New York Court of Appeals decides it 4/3, may he be criticized for not having raised that?
>
> MR. RUBIN: **I would agree with that. I would think that Patterson at the time was possibly a viable issue.**

(Keenan Tr. at 18)(emphasis added). Appellate counsels' argument, contrary to Magistrate Bernikow's ("weak") characterization, was a good one.

In criticizing appellate counsels' **third** argument (i.e., concerning certain *Rosario* claims), Magistrate Bernikow states:

> [appellate counsel] argued that the trial order [sic] erred by ruling that the prosecution could ask its witness whether they had given a statement to the authorities and, if so, to turn it over to the defense **in the presence of the jury.** The appellate brief complained about this procedure because a decision not to cross-examine a witness about a prior statement would lead the jury to believe that the statement was consistent with the witness's trial testimony.
>
> Counsel cited no authority for this argument. Yes, he cited *Crawford v. Nilan*, 289 N.Y. 444, 46 N.E.2d 512 (1943), but only for the familiar principle that the prior consistent statement of a witness cannot bolster his testimony.... *Crawford*, a civil case, had nothing to do with *Rosario*. Also, the brief cited no instance where the challenged procedure occurred and, hence, failed to show, what, if any, prejudice resulted.

(Report at 10–11)(emphasis added). Again, this Court strongly disagrees with Magistrate Bernikow. The trial judge's handling of this matter could well have been prejudicial to Petitioner and was properly raised on appeal. Again, at oral argument before Judge Keenan in on Jan-

uary 27, 1997, Petitioner's counsel acknowledged the merit of appellate counsels' argument:

> [JUDGE KEENAN]: **The evidentiary ruling by the judge was the one—one of the wildest rulings I ever read about.**
>
> MR. RUBIN: I agree with the court.... The method in doing that gave the jury the clear impression, or would give the jury the clear impression there was nothing inconsistent in the statements if it wasn't used to cross-examine....

(Keenan Tr. at 18–19)(emphasis added). Magistrate Bernikow was simply wrong. There can be no serious dispute that this was a strong issue to raise on appeal.

**Claims Not Pursued By Appellate Counsel**

It is clear to the Court that appellate counsels' representation of Petitioner was well within the wide range of competence required under the Sixth Amendment. *See Strickland,* 466 U.S. at 689–90, 104 S.Ct. 2052. Nevertheless, the Court will briefly address—because Magistrate Bernikow did—appellate counsels' failure to raise certain (other) issues on appeal, namely, the trial court's jury instructions on insanity and the District Attorney's alleged failure to turn over to Petitioner certain alleged *Rosario* material.

*Trial Court's Insanity Jury Instruction*

 As reflected in Magistrate Bernikow's Report, Petitioner claims that the trial court's instruction on insanity was incorrect. New York Penal Law § 30.05, which was in effect at the time of the trial, provided that:

> 1. A person is not criminally responsible for conduct if at the time of such conduct, as a result of mental disease or defect, he lacks substantial capacity to know or appreciate either:

> (a) The nature and consequences of such conduct; or

> (b) That such conduct was wrong.

> 2. In any prosecution for an offense, lack of criminal responsibility by reason of mental disease or defect, as defined in subdivision one of this section, is a defense.

N.Y. Penal Law § 30.05 (McKinney 1975).[28] Under § 30.05, the State must prove that "the defendant was in fact criminally responsible in that he possessed

> (1) the substantial mental capacity to know, *and*

> (2) the substantial mental capacity to appreciate, *both*

> (3) the nature and consequences of his conduct, *and*

> (4) that such conduct was wrong." 1 Criminal Jury Instructions of the State of New York (1983) at 808 (emphasis in original).

In instructing the jury, the trial judge (in 1975) initially read the provisions of § 30.05 to the jury accurately. (Trial Tr. at 924). It appears, however, that at subsequent instances, in attempting to adapt the statute for purposes of the jury instructions, the trial judge failed properly to change the disjunctive ("or") to the conjunctive ("and"), connecting mental capacity to know "and" mental capacity to appreciate. By way of example, the trial judge instructed the jury as follows:

> The first possible verdict is guilty of murder. If you find beyond a reasonable doubt that the Defendant killed Elfredie Bernhardt and intended to kill Elfredie Bernhardt and did so while possessing substantial capacity to know or appreciate the nature and consequences of his conduct and such conduct was wrong, your verdict should be guilty of murder.

---

**28.** In 1984, § 30.05 was repealed. Its equivalent, N.Y. Penal Law § 40.15, makes the defense an affirmative defense; as such, the defendant has the burden of establishing the defense by a preponderance of the evidence. N.Y. Penal Law § 25.00(2) (McKinney 1987).

(Trial Tr. at 942–43)(emphasis added). Petitioner's trial counsel, Messrs. Hoffinger and Goldschlag, did not object to this instruction. Mr. Hoffinger affirmatively waived any claim with respect to the instruction by stating that "I have no quarrel with the statement what legal insanity is." [29] (Trial Tr. at 955). Although, failure to timely object to a jury instruction generally fails to preserve it for appellate review, *see, e.g.,* N.Y.Crim. Proc. Law. § 470.05(2), Petitioner, as noted, does not claim that trial counsel was ineffective.

Even though the jury instruction in question was not challenged and was, thus, unpreserved for appellate review, Magistrate Bernikow concluded that the erroneous jury charge should have been pursued on direct appeal because the Appellate Division might have exercised its discretion and reviewed the unpreserved claim "in the interests of justice." (Report 8–10, 12–17).[30] In reaching this conclusion, Magistrate Bernikow relied, in large part, on *People v. Buthy,* 38 A.D.2d 10, 326 N.Y.S.2d 512 (1971), where the trial court made the same error at issue here, i.e., charging "know or appreciate" instead of "know and appreciate." Over the dissent of Judge Moule, the Court in *Buthy* (Appellate Division, Fourth Department), "reluctantly" reversed the defendant's conviction. *Id.* at 514.[31]

But there is a substantial difference between *Buthy* and the instant case. In *Buthy,* defense counsel "excepted to [the erroneous charge] and requested that the court charge on that subject in accordance with defendant's previously submitted written requests to charge. The court refused such request, and defendant excepted thereto." *Id.* at 516.[32] Here, defense counsel did not object to the charge at issue. (Trial Tr. at 955).[33]

Appellate counsel here did raise a number of strong and substantial arguments on appeal (*see,* above) going to the core of Petitioner's defense. Failure to raise an unpreserved claim on appeal did not result in ineffective assistance of appellate counsel and the Court respectfully rejects Magistrate Bernikow's recommendation in this regard.

Moreover, the Court strongly disagrees with Magistrate Bernikow's conjecture that "a reasonable probability existed that had the issue been raised, the Appellate Division, Second Department, would have

---

**29.** Petitioner's trial counsel did object, however, to the trial court's jury charge regarding intoxication. (Trial Tr. at 955–57).

**30.** While Magistrate Bernikow cited to a number of cases in which the Appellate Division exercised its "interest of justice" jurisdiction, most of these cases were decided well after Petitioner's direct appeal in 1976. *E.g. People v. Hays,* 132 A.D.2d 620, 517 N.Y.S.2d 775 (1987). This (further) suggests that the "distorting effects of hindsight" might have interfered with Magistrate Bernikow's assessment of appellate counsels' performance. *Strickland,* 466 U.S. at 690, 104 S.Ct. 2052.

**31.** In his dissent, Judge Moule noted that "know" and "appreciate" have been "defined as meaning the same thing and are synonymous." *Buthy,* 326 N.Y.S.2d at 520 n. 1.

**32.** In a letter to the Court dated March 29, 1999, counsel for Respondent stated that: "Your Honor requested that I review our file to determine whether it contains a written request to charge submitted by defense or jointly. There is no indication of any such document in our file. This is consistent with [Petitioner's counsel's] suggestion that, unlike today, a pre-charge conference was not routine in 1976." (Letter dated March 29, 1999).

**33.** Petitioner does not suggest that the Appellate Division, Second Department, has ever adopted the Fourth Department's analysis and conclusion in *Buthy.*

In his post-hearing letter brief, dated June 28, 2000, Petitioner's counsel claims for the first time that, in addition to the alleged *Buthy* errors the trial court also mis-instructed the jury "in the identical fashion that occurred in *People v. Kelly* [302 N.Y. 512, 99 N.E.2d 552 (1951)]." (Petitioner's Post-Hearing Brief at 4). However, having reviewed the relevant portions of the trial transcript (Trial Tr. at 926–27), as well as the *Kelly* decision, this Court fails to see how the trial court's instruction here is in any sense "identical" to that at issue in *Kelly.* *Kelly* is inapposite to the case at bar.

adopted the holding in *Buthy* and reversed petitioner's conviction." (Report at 16). In fact, the Appellate Division, Second Department examined this very issue in connection with Petitioner's coram nobis appeal in 1991 and rejected it. In its Decision and Order on Motion dated November 21, 1991, the Appellate Division, Second Department ruled that Giraldi **"has not established that retained counsel rendered ineffective assistance in connection with his 1976 appeal."** (Decision and Order on Motion dated November 21, 1991)(emphasis added). *See also People v. Cornish,* 43 A.D.2d 103, 349 N.Y.S.2d 694 (1973)(refusing to reverse defendant's conviction in the "interests of justice" where defense counsel did not object at trial and defendant's "guilt is clear").

### Rosario Claims

▮▮▮▮ Petitioner's contention that his appellate counsel was ineffective because they (allegedly) did not raise certain *Rosario* issues on appeal, flies in the face of the rule that " '[f]ailure to turn over Rosario material is not a basis for habeas relief as the Rosario rule is purely one of state law.' " *Stephens v. Costello,* 55 F.Supp.2d 163, 167 (W.D.N.Y.1999)(quoting *Green v. Artuz,* 990 F.Supp. 267, 274 (S.D.N.Y.1998)).[34] Petitioner here attempts to circumvent the consequences of this clear rule by pursuing his *Rosario* claim in the guise of a claim of ineffective assistance of appellate counsel. While Petitioner's *Rosario* claim may fail for this reason alone, it is also fatally deficient for other reasons as well. While acknowledging that appellate counsel did raise several *Rosario* issues on appeal, Magistrate Bernikow narrowly parses (and gives credence to) Petitioner's instant *Rosario* claim stating that "Petitioner now complains about the trial court's failure to direct the prosecutor to turn over summaries of the statements of witnesses." (Report at 17).

The Court concludes that this (and all other) *Rosario* claims were adequately raised by appellate counsel. In their brief on direct appeal, dated August, 1976, appellate counsel argued that:

The court ... improperly den[ied] defense counsel complete access to prior statements of prosecution witnesses. Prior written statements of law enforcement officers who testified were not turned over to the defense in their entirety. The prosecutor contended that he was obliged to turn over only those portions which he concluded were relevant to the witness' direct testimony, even though he conceded that the entire statements related to the Bernhardt investigation. The court proceeded to review the statements *in camera* and refused to order them turned over in their entirety (T132–38). **This was clearly erroneous.... [appellate counsel then cited a number of cases including *People v. Rosario,* 9 N.Y.2d 286, 213 N.Y.S.2d 448, 173 N.E.2d 881 (1961)].** (Petitioner Brief on Direct Appeal at 30–31).

In his Report, Magistrate Bernikow stated that "counsel's failure to argue that the trial court's *Rosario* ruling constituted reversible error was objectively unreasonable and constitutionally deficient." (Report at 19–20). This Court disagrees.

The Court finds that appellate counsel made a clear and comprehensive *Rosario* argument which adequately presented the issue on direct appeal to the Appellate Division. The Court agrees with Judge Keenan's observation that the Appellate Division was squarely presented with Petitioner's *Rosario* claims: "Rosario was all over the case. Whether it was argued exactly the same way that it was argued in the coram nobis, the appellate tribunal's attention was directed to the Rosario issue." (Keenan Tr. at 23). Even assuming, *arguendo,* that appellate counsel did not raise certain (precise) *Rosario* claims

---

**34.** The contention also flies in the face of the facts adduced in connection with this Court's

May 16, 2000 hearing, discussed at page 27–28, below.

on appeal, an attorney's decision to pursue one *Rosario* claim on appeal as opposed to another *Rosario* claim appears to be precisely the type of strategic decision which the Supreme Court cautioned should not be second guessed. *See Strickland,* 466 U.S. at 690, 104 S.Ct. 2052 ("strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable").

**Most importantly, based on the hearing held before this Court on May 16, 2000, it appears that the *Rosario* claims raised by Petitioner in the instant case were, in fact, rendered moot at the trial in 1975.** Mr. Hoffinger testified that "Something happened during the trial where I know that the *Rosario* issue that I was raising with Judge Beisheim was mooted, there is no question about that, because I recall, not specifically but generally, that Bill Fredreck, the prosecutor, showed me some material, and it became moot." (Hearing Tr. at 24). Mr. Goldschlag testified that "I have a recollection of walks to and from Judge Beisheim's chambers to the courtroom, in which Mr. Fredreck was present. I believe that there were some discussions about *Rosario* material in that. I have some recollection that something occurred which mooted out or made academic that issue." (Hearing Tr. at 50). Indeed, something did occur.

Mr. Fredreck, although unable to attend the hearing on May 16, 2000, advised in a Stipulation dated June 19, 2000, that, among other things:

> If called to testify before this Court, said William Fredreck would testify to his best recollection accurate to a "high degree of confidence" to the following effect in regard to *Rosario* materials that consisted of police reports that set forth the statements of a civilian witness in the form of a report made by a police officer (i.e., "*Consolazio* " material), as opposed to statements made in the handwriting or under the signature of that witness:

> a. **In spite of an early ruling by the trial court that the People were not required to produce such *Consolazio* material regarding witnesses Audrey Rosen and David Zlowe, which had been requested by defense attorney Jack Hoffinger, Esq., William Fredreck did produce that that [sic] *Consolazio* material regarding witnesses Rosen and Zlowe later in his direct case; and**

> b. William Fredreck so produced the aforesaid material to the defense regardless of whether the particular police officer who made such written report was called to the stand; and

> c. Such material would not have been marked for identification or indicated in the record, as, after witness John Monks, William Fredreck terminated his prior practice of so marking and indicating *Rosario* materials produced to the defense.

(Stipulation dated June 19, 2000)(emphasis added).

Magistrate Bernikow did not offer appellate counsel the opportunity to be heard before (unfairly) concluding—years after the fact—that they had been ineffective in a Constitutional sense. His conclusions are: internally inconsistent; contrary to established precedent; and (at least) in the case of his *Rosario* recommendation, based upon demonstrably false factual determinations.

*Conclusion*

For the foregoing reasons, the Report is adopted in part and rejected in part. The writ of habeas corpus is denied.