IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs July 22, 2003

## STATE OF TENNESSEE v. DARRELL GLEN SMITH

**Appeal from the Circuit Court for Cocke County**
**No. 7923     Ben W. Hooper, II, Judge**

---

**No. E2002-01988-CCA-R3-CD**
**December 18, 2003**

---

The defendant, Darrell Glen Smith, appeals as of right from his conviction by a jury in the Cocke County Circuit Court for first degree murder. The defendant was sentenced to life imprisonment with the possibility of parole. He contends that (1) the evidence is insufficient to support the jury's rejection of his insanity defense and (2) the trial court erred in failing to grant a new trial due to juror misconduct. We affirm the trial court's judgment of conviction.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

JOSEPH M. TIPTON, J., delivered the opinion of the court, in which GARY R. WADE, P.J., and NORMA McGEE OGLE, J., joined.

Edward C. Miller, District Public Defender, for the appellant, Darrell Glen Smith.

Paul G. Summers, Attorney General and Reporter; John H. Bledsoe, Assistant Attorney General; Al C. Schmutzer, Jr., District Attorney General; and James B. Dunn, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

This case relates to the defendant's killing his mother on June 2, 1998. Rose Dixon, a driver for Quality Transportation, testified that her job was to transport medical and mental patients and that she picked up the defendant from Peninsula Hospital on June 1, 1998. She said he refused to engage in any conversation with her and when asked questions, he only replied with short responses. On cross-examination, she testified that if she had known about the defendant's condition, she would not have transported him.

Ulyss Smith, the defendant's brother, testified that he went to his mother's home on June 2 to look for her after his aunt had told him that she could not find his mother. He said that when he arrived at his mother's home, he saw the defendant, who said that their mother was sleeping. He said that he opened their mother's bedroom door but did not see her and that the defendant told him that

he needed to leave. He said he did not see any blood on the defendant at that time. He said that he returned to the victim's home with his brother-in-law, Steve Taylor, but that the defendant was not there. He said they went to the back bedroom and found his mother covered in blood. He said his aunt then called the police. He said that he next saw the defendant when the defendant was arrested and that the defendant had blood on his stomach at that time. On cross-examination, he said the defendant looked dirty when he saw him on June 2.

Armondo Fontes, a police officer for the Cocke County Sheriff's Department, testified that on May 22, 1998, he was sent to the victim's home to transport the defendant to an emergency room to have him evaluated and that on June 2, he answered a domestic dispute call at the victim's home. He said that when he arrived, he first talked to Mr. Taylor, who told him "he's killed her." He said he then knocked on the door at the victim's home and the defendant came out with blood on his stomach. He said that after handcuffing the defendant, the defendant stated, "I had to kill her, she was trying to poison me." On cross-examination, Fontes said that on May 22, the defendant appeared to be normal and was cooperative. He said that on June 2, the defendant told him his mother had forced him to castrate himself. He said there was nothing at the victim's home indicating the defendant tried to conceal evidence.

Danny Ray Reece, a police officer in the Cocke County Police Department, testified that on June 2, he was the first officer to enter the victim's home. He said the ceiling fan light was broken, blood was on the ceiling, and there were fresh signs of a forced entry into the bedroom. He said that while he was inside the victim's home, he found an ax, a steel rod wrapped in electrical tape, and two bloody knives. On cross-examination, Reece said the victim's body did not appear to have been moved since the killing and the weapons were in plain view.

Duane Johnson, a special agent for the Tennessee Bureau of Investigation, testified that on June 2, he saw an ax and a steel rod with electrical tape wrapped around it in the victim's living room. He said there were strands of hair and a reddish-brown stain on the electrical tape. He said he saw what appeared to be blood on the following: the front porch, the living room floor, the kitchen sink, the hallway floor, the doorknob of the back bedroom, the victim's bed, the curtains and walls of the back bedroom, two knives, a pair of glasses that belonged to the defendant, and in the defendant's bedroom. He said the victim's head had been cut in multiple places and her right arm had large areas of discoloration. On cross-examination, Johnson said that he had never investigated a murder case where the weapons were left in plain view.

Dennis Ray Daniels, a special agent for the Tennessee Bureau of Investigation, testified that he interviewed the defendant at the hospital after the victim was killed. He said the defendant stated that the victim forced him to kill her and that she previously forced him to castrate himself. He said the defendant stated that on the night of June 1, he vomited after eating barbeque and potato salad. He said the defendant stated his mother had poisoned him. Daniels said the defendant stated that he was mad and afraid and that he snapped, first hitting his mother with a steel rod. He said the defendant stated that he hit the victim with the ax multiple times because the victim "would not go down." He said the defendant stated that he stabbed himself in the heart three times to try and "get

it over with." He said the defendant stated that he stabbed his mother and went to bed but did not sleep more than five minutes that night. On cross-examination, Daniels testified that the defendant was very alert during their interview but that he was not sure how aware the defendant was of his surroundings.

Dr. Cleland Blake, a forensic pathologist, testified that he performed an autopsy on the victim's body and found multiple wounds to the head, a tear on the left middle finger, a deep bruise on the left arm, a bruise on the right shoulder, and a tear in the skin on the right arm. He said some of the cuts on the victim's head were the result of a blunt object while others were the result of a knifelike object. He said the electrical tape on the steel rod was likely used for a better grip. He said the cause of death was blunt trauma to the head.

Regina Fine, the defendant's sister, testified that when the defendant was young, he witnessed his brother's death when a car ran over him. She said that the defendant began to act peculiar in his late teens and that he never moved out of his mother's home. She said her husband had to take the defendant to the emergency room in 1996 when he castrated himself with grass clippers. She said the defendant had to go to the emergency room and mental facilities multiple times for his mental problems. She said the defendant always stayed in his room and she did not remember him ever leaving the home. She said the defendant called their mother the devil and a "son-of-a-bitch." She said that on June 1, 1998, she talked to her mother and her mother said the defendant was nervous and pacing around the home. She said their mother did everything for the defendant and there was no rational reason for him to kill her.

On cross-examination, Mrs. Fine testified that she was on friendly terms with the defendant but that he would not visit with her. She acknowledged that the defendant was mad at their mother and the rest of the family when no one would co-sign a loan in order that he could buy a motorcycle. She denied telling an employee of Forensic Services that the defendant told her he could kill her anytime he wanted. Billy Fine, the defendant's brother-in-law, testified that he drove the defendant to the hospital on May 14, 1996, after the defendant castrated himself. He said the defendant was bleeding all over but showed no emotion.

Susan Janelle Dyer, the defendant's sister, testified that the defendant began acting peculiar during his senior year in high school and would isolate himself from the rest of the family, only leaving his room at night when everyone else was in bed. She said that his personal hygiene was bad and that he never combed his hair. She said there was no rational reason for him to kill their mother.

Tunney Moore, the former Sheriff of Cocke County, testified that he went to the same church as the victim and that she told him she was afraid of the defendant. He said he helped the victim send the defendant to a mental health facility on several occasions when the defendant scared or assaulted her. He said that on June 2, when he asked the defendant why he had killed his mother, he said she was trying to poison him. Pat Taylor, a deputy for the Cocke County Police Department in 1998, testified that on May 22, he picked the defendant up at the victim's home and drove him to a mental health facility. On the way, the defendant said he was going to hurt his mother because

she had made him do bad things and had made him castrate himself. He said the defendant stated that his mother was poisoning him and trying to kill him.

Eric S. Engum, a clinical psychologist specializing in neuropsychology and forensic psychology, testified that the defendant suffers from paranoid schizophrenia "continuous with prominent negative symptoms." He said records from three separate mental institutions where the defendant was evaluated confirmed this diagnosis. He said the defendant did not appreciate the wrongfulness of his conduct when he killed his mother and still did not understand that killing his mother was wrong. He said the defendant believed that his mother was the devil, that she poisoned him, that she injected him with chemicals at night, and that she mentally forced him to castrate himself.

Dr. Engum said that in a test to determine the defendant's ability to function in a community, the defendant's score was at the bottom. He said records from Cherokee Health Systems reported the defendant as having delusions about his mother as early as 1986. He said the reports indicated the defendant had both visual and auditory hallucinations. He said the defendant was taken to Lakeshore Mental Health Institute in 1986 because he met the emergency commitment requirement, that he was a threat to himself or others. He said records indicated the defendant suffered from extreme side effects due to the medications he used to control the schizophrenia.

Dr. Engum said that in May 1994, the defendant became depressed and exhibited violent behavior, including beating his mother. He said the defendant was both homicidal and suicidal. He said that in 1996, when the defendant castrated himself, he gave various reasons for his conduct, including the following: (1) the people at Cherokee Mental Health Center told him that if he did this, it would set him free; (2) his psychologist told him to do it; (3) it was his way of avoiding being sold into white slavery; and (4) his mother told him it was the only way he could be free of sin.

Dr. Engum said that at Peninsula Hospital in 1998, nine days before the defendant killed his mother, the defendant said that voices told him to kill his mother to avoid being sold into white slavery. He said the report stated the defendant was delusional and angry. He said that on June 1, 1998, Peninsula discharged the defendant. He said that when he met with the defendant in 2001, the defendant still had delusions about his mother. He said he had no doubt that on June 2, 1998, the defendant was suffering from psychotic delusions as a result of his paranoid schizophrenia and that the defendant was reacting honestly to his delusions when he killed the victim. He said that the defendant believed that his mother was the devil, that he was saving the world from her, and that he was the only person in the world who could perceive the victim's true nature. He said he believed the defendant could never function in society and needed permanent supervision to prevent the defendant from hurting himself or others. He said that in 1998, the defendant was not in reality at all. Dr. Engum said that he had been involved in over two hundred criminal cases and that this was only the second time he had testified that a defendant could not understand the wrongfulness of his actions.

On cross-examination, Dr. Engum testified that the defendant was not mentally retarded. He acknowledged that his diagnosis was based, in part, on what the defendant told him. He said that Peninsula Hospital's records reflected that the defendant was still experiencing auditory hallucinations when he was discharged on June 1. He admitted that being mentally ill does not necessarily mean that a person cannot appreciate the difference between right and wrong. He stated that people with mental illnesses can still add and subtract but that this goes to their IQ, not their mental stability. He acknowledged that reports from 1999, 2000, and 2001 record the defendant as having good hygiene and his thought process as being orderly and relevant. He stated, however, that he questioned the accuracy of those reports. He agreed, though, that there were improvements when the defendant was hospitalized and given medication. Dr. Engum denied there being a possibility that the defendant was pretending to be delusional to avoid criminal responsibility. He admitted that when the defendant told his brother that their mother was asleep, one possible inference is that the defendant knew right from wrong. On redirect examination, Engum testified that the reports that said the defendant had good hygiene and was orderly and relevant may be flawed because they were not made by a psychiatrist or psychologist and were made by watching the defendant through a small glass hole.

Dr. Rokeya S. Farooque, a psychiatrist, testified that although the defendant was not competent to stand trial in 1998, he was competent at the time of his trial. She said that the defendant suffered from paranoid schizophrenia but was able to appreciate the wrongfulness of his acts when he killed the victim. She said the defendant was given Haldol, a drug used to decrease hallucinations and delusions, at Peninsula Hospital before being released on June 1, 1998. She said that Haldol stayed in the bloodstream for three to four weeks.

On cross-examination, Dr. Farooque acknowledged that the defendant was a paranoid schizophrenic, had been extremely psychotic at times, and had been having psychotic delusions about his mother since 1986. She said reports indicated that the defendant was stable on medication at the time of his discharge from Peninsula Hospital on June 1 and that he committed the killing just hours later. She said that the defendant never claimed he heard voices during the incident telling him to kill his mother which, in combination with the defendant taking medication, indicated there was no hallucination or delusion that made the defendant unable to appreciate the wrongfulness of his actions. She admitted she would not have discharged a patient if she knew he was continuing to have delusions and hallucinations. She said the defendant was given oral Haldol when he was discharged, which would be used to supplement the injection of Haldol if the injection was insufficient to stabilize him mentally. She admitted that if the injection was insufficient and the defendant did not take his oral medication, he could become psychotic.

Sam Craddock, a psychologist, testified that in September 1998 the defendant was not competent to stand trial but that he was competent by August 1999. He said he concluded the defendant appreciated the nature of his actions when he killed the victim based on the following factors: (1) the defendant told Mrs. Fine, his sister, that he could kill her anytime he wanted; (2) the defendant sometimes got upset with his mother when he was not psychotic; (3) on June 1, the attending physician, Dr. May, did not describe the defendant as being psychotic; and (4) when he was

diagnosed after the killing on June 2, the defendant did not say he killed his mother because she poisoned him. Dr. Craddock said he believed it was just as likely that the defendant killed his mother because he was upset with her as it was that he killed her because he was having a psychotic delusion. On cross-examination, Dr. Craddock testified that he did not know for certain whether the defendant was psychotic at the time of the victim's killing and that if he was psychotic, he might have been unable to appreciate the wrongfulness of his actions.

The jury convicted the defendant of first degree murder. The defendant contends that he should have been found not guilty by reason of insanity because he could not appreciate the wrongfulness of his actions when he killed his mother. In the alternative, he contends that he should receive a new trial because the jury improperly considered whether the defendant would spend a long time in an institution if they found him not guilty by reason of insanity. We affirm the defendant's conviction.

## I. INSANITY DEFENSE

The defendant contends that he proved by clear and convincing evidence that he was insane at the time of the killing. With regard to the defense of insanity, T.C.A. § 39-11-501 provides as follows:

> (a) It is an affirmative defense to prosecution that, at the time of the commission of the acts constituting the offense, the defendant, as a result of a severe mental disease or defect, was unable to appreciate the nature or wrongfulness of such defendant's acts. Mental disease or defect does not otherwise constitute a defense. The defendant has the burden of proving the defense of insanity by clear and convincing evidence.

> (b) As used in this section, "mental disease or defect" does not include any abnormality manifested only by repeated criminal or otherwise antisocial conduct.

> (c) No expert witness may testify as to whether the defendant was or was not insane as set forth in subsection (a). Such ultimate issue is a matter for the trier of fact alone.

With respect to appellate review of a jury's rejection of a defendant's insanity defense, our supreme court has stated:

> [A]ppellate courts in Tennessee should apply the reasonableness standard when reviewing a jury's rejection of the insanity defense. Consistent with the expressed legislative intent of Tenn. Code Ann. § 39-11-501(c) and other Tennessee standards governing appellate

review of factual findings, this standard is properly deferential to the finding of the trier of fact. On the other hand, this standard does not totally insulate the jury's finding from appellate review; rather, it enhances appellate review by virtue of its similarity to the familiar sufficiency standard which appellate courts are accustomed to applying. Accordingly, appellate courts in Tennessee should reverse a jury verdict rejecting the insanity defense only if, considering the evidence in the light most favorable to the prosecution, no reasonable trier of fact could have failed to find that the defendant's insanity at the time of the offense was established by clear and convincing evidence . . . . [W]e explicitly reject the notion that the State must rebut defense proof of insanity with substantial evidence. The current statute clearly does not impose such a burden of proof on the prosecution. The statute places the burden of establishing this affirmative defense squarely on the defendant. Once this defense has been interposed, the prosecution likely will in most cases attempt in some manner to counter the defense proof . . . . [D]efense proof can be countered by contrary expert testimony, lay witnesses, or vigorous cross-examination designed to undermine the credibility of the defense experts. A reviewing court applying the reasonableness standard should consider all the evidence in the record in the light most favorable to the state in determining whether the jury appropriately rejected the insanity defense.

. . . .

The weight and value to be given expert testimony is a question for the jury. [State v. Sparks, 891 S.W.2d 607, 616 (Tenn. 1995)]. Where there is a conflict in the evidence, the trier of fact is not required to accept expert testimony over other evidence and must determine the weight and credibility of each in light of all the facts and circumstances of the case. Id. Questions concerning the credibility of witnesses, the weight and value of the evidence, as well as all factual disputes raised by the evidence, are for the trier of fact; appellate courts do not reweigh the evidence or reevaluate credibility determinations. [State v. Holder, 15 S.W.3d 905, 912 (Tenn. Crim. App. 1999)].

State v. Flake, 88 S.W.3d 540, 554 (Tenn. 2002).

Evidence existed to show that the defendant was not psychotic or suffering from delusions and hallucinations at the time of the offense. The defendant had taken an injection of Haldol while at Peninsula Hospital, a medication that is usually effective in preventing delusions and

hallucinations for three to four weeks. Dr. Farooque stated she believed that this medication should have prevented the defendant from becoming psychotic after being discharged on June 1. Moreover, after the killing, reports from the Cherokee Crisis Team indicated that the defendant did not claim his mother was poisoning him when they interviewed him on June 2.

Evidence also existed to show that the defendant appreciated the wrongfulness of his actions when he killed the victim. When the defendant's brother came to the victim's home, the defendant lied and told his brother that the victim was sleeping and said he should leave. Although not conclusive, this suggests that the defendant knew that he did something wrong because he did not want his brother to discover that he had killed their mother. Moreover, the defendant had previously been upset with his mother and the rest of the family when they did not co-sign a loan for him so that he could buy a motorcycle. Although Mrs. Fine denied it, Dr. Craddock noted that the defendant told his sister that he could kill her any time he wanted. The defendant told Mr. Daniels in their interview after the killing that he was mad and afraid when he killed the victim. Dr. Craddock testified that it was as likely that the defendant became upset with his mother for trying to convince him to take his medication or for some other reason and decided to kill her. Dr. Craddock did not believe delusions and hallucinations caused the defendant to kill the victim.

The evidence shows that the defendant suffered from paranoid schizophrenia. Having this mental disease, however, does not preclude the possibility that he could be found legally sane by a jury. T.C.A. § 39-11-501(a) (1997). It was the jury's responsibility to give the proper weight and value to the expert and lay witnesses in determining whether the defendant was insane by clear and convincing evidence. Flake, 88 S.W.3d at 554. Although the defendant argues that the jury erred in not finding him insane at the time of the killing, the jury chose to accredit the witnesses who supported the state's theory of the case: that the defendant's medication was effective; that he was not psychotic and delusional at the time of the killing; and that he knew his actions were wrong when he killed his mother. In the light most favorable to the state, a rational trier of fact could have failed to find that the defendant's criminal insanity at the time of the offense was established by clear and convincing evidence. The evidence is sufficient to justify the defendant's conviction.

## II. JUROR MISCONDUCT

The defendant contends that he should receive a new trial because the jury improperly considered how long the defendant would be institutionalized if they found him not guilty by reason of insanity. The state argues that the defendant's evidence of juror misconduct is not allowed under Tennessee Rule of Evidence 606(b) and that the trial court properly denied the defendant's motion for a new trial. We agree with the state.

During deliberations, the jury submitted a question to the trial court asking whether the defendant would be institutionalized for a long period of time if it found the defendant not guilty by reason of insanity. The trial court told the jury that the court would not answer its question and that the jury should remember the evidence and the law as it had been given. At the hearing for a new trial, the defendant offered the trial court several questionnaires he sent to jurors after the trial and

notes he had taken during a phone conversation with one juror after the trial as evidence that the jury improperly considered the question of how long the defendant would be institutionalized.  In one juror's questionnaire, the juror stated that he or she would have found the defendant not guilty by reason of insanity if assured that the defendant would have been treated for a long period of time.  In addition, defense counsel's notes from a telephone conversation with a juror reflected that the juror would have voted "guilty but insane" if that had been an option.  The trial court refused to consider the juror information.

Rule 606(b), Tenn. R. Evid., precludes a juror from testifying or offering an affidavit "as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon any juror's mind or emotion as influencing that juror to assent to or dissent from the verdict."  Three exceptions to this rule are that a juror may testify or offer an affidavit as to (1) whether extraneous prejudicial information was improperly brought to the jury's attention, (2) whether any outside influence was improperly brought to bear upon any juror, or (3) whether the jurors agreed in advance to be bound by a quotient or gambling verdict without further discussion.  Id.

As the Advisory Commission Comment notes, this rule is the codification of the supreme court's adoption of Rule 606(b), Fed. R. Evid., in State v. Blackwell, 664 S.W.2d 686, 688 (Tenn. 1984).  If the defendant shows that the jury has been subjected to extraneous prejudicial information or improper influence, then we presume prejudice and the burden shifts to the state to rebut this presumption by either explaining the exposure or proving that it was harmless.  Id. at 689.  The information that the jurors provided the defendant cannot be offered in court unless it qualifies under one of the three exceptions in 606(b).  In the present case, unless the information is extraneous, it is inadmissible under Tenn. R. Evid. 606(b).  "Extraneous means 'coming from without.'" State v. Coker, 746 S.W.2d 167, 171 (Tenn. 1988) (holding that the jurors' alleged discussion about the possibility that the defendant would hire someone to kill them was inadmissible because the defendant had not shown that the jury learned of the threat from an outside source).  The trial court in this case questioned whether the information was extraneous but ultimately found that it was not in denying the defendant's motion for a new trial.

The defendant bears the burden of showing that the jurors were exposed to extraneous information and that their testimony is thereby permitted under Rule 606(b), Tenn. R. Evid. See Blackwell, 664 S.W.2d at 689.  In State v. Henley, a capital post-conviction case, the petitioner sought to introduce an affidavit from one of the trial jurors in support of his claim of ineffective assistance of counsel.  960 S.W.2d 572 (Tenn. 1997).  The affidavit related to the jury's mindset concerning the refusal of the petitioner's mother to testify during the sentencing phase of the trial.  The supreme court stated that "the juror's affidavit related to the precise subject matter about which a juror is strictly forbidden from testifying by Rule 606(b)." Id. at 581.  The court held that this evidence "violates the express terms of Rule 606(b) and should not have been considered" in the post-conviction proceeding. Id.  Likewise, in the present case, the defendant introduced exhibits at the hearing for a new trial where the subject matter related to the jury's mindset.  Accordingly, this

information was not extraneous and not properly before the trial court. It cannot be used to show juror misconduct.

In any event, even were we to consider the jury information submitted by the defendant, we would still be unpersuaded that there was any juror misconduct. The juror in the questionnaire stated that the jury decided unanimously that the defendant appreciated the wrongfulness of his conduct. Even if the jurors thought about what would happen if they found him not guilty by reason of insanity, this does not negate their finding that the defendant appreciated the wrongfulness of his actions.

Based upon the foregoing and the record as a whole, we affirm the judgment of conviction.

_____
JOSEPH M. TIPTON, JUDGE